# Illinois Official Reports

## Supreme Court

---

### *People v. Harris*, 2018 IL 121932

---

| | |
|---|---|
| Caption in Supreme Court: | THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. DARIEN HARRIS, Appellee. |
| Docket No. | 121932 |
| Filed | October 18, 2018 |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Nicholas Ford, Judge, presiding. |
| Judgment | Appellate court judgment affirmed in part and reversed in part. |
| Counsel on Appeal | Lisa Madigan, Attorney General, of Springfield, and Kimberly M. Foxx, State's Attorney, of Chicago (David L. Franklin, Solicitor General, Michael M. Glick and Gopi Kashyap, Assistant Attorneys General, and Alan J. Spellberg, Assistant State's Attorney, of counsel), for the People. |
| | James E. Chadd, State Appellate Defender, Patricia Mysza, Deputy Defender, and Lauren A. Bauser, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee. |
| | Bluhm Legal Clinic, of Chicago (Shobha L. Mahadev and Scott F. Main, of counsel, and Margaret Houseknecht and Kathleen Ryan, law students), for *amici curiae* Children & Family Justice Center *et al.* |

Justices           JUSTICE KILBRIDE delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Thomas, Garman, and Theis concurred in the judgment and opinion.

Justice Burke specially concurred, with opinion.

Justice Neville took no part in the decision.

**OPINION**

¶ 1      The defendant, Darien Harris, was convicted of first degree murder (720 ILCS 5/9-1(a)(1) (West 2010)), attempted first degree murder (720 ILCS 5/8-4(a), 9-1 (West 2010)), and aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2010)) and sentenced to a mandatory minimum aggregate term of 76 years' imprisonment. Defendant was 18 years, 3 months of age at the time of the offenses. The appellate court vacated defendant's sentences and remanded for resentencing, holding that, as applied to his circumstances, the aggregate prison term violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). 2016 IL App (1st) 141744. For the following reasons, we affirm in part and reverse in part the appellate court's judgment.

¶ 2                          BACKGROUND

¶ 3      Defendant was charged in Cook County circuit court with several offenses following a shooting at a Chicago gas station. At defendant's bench trial, Ronald Moore testified that he was riding in the backseat of a car driven by his younger brother, Rondell Moore. A person identified as Marcus Diggs was also in the car. When the car began to overheat, Rondell drove into a gas station parking lot and parked the car, and Rondell and Marcus Diggs went into the store to buy antifreeze. A local mechanic Ronald knew as "Red," later identified as Quincy Woulard, arrived on his bicycle and began looking under the hood of the car. Rondell came back to the car and was standing outside talking to Woulard.

¶ 4      Ronald stayed in the backseat of the car and saw a black Lexus turn into the gas station parking lot. Ronald testified that he had seen the Lexus previously and recognized the driver, but he did not know the driver's name. The Lexus went to the other side of the gas station building where Ronald could no longer see it. A short time later, Ronald heard gunshots, looked out the rear driver's-side window, and saw defendant two feet away shooting a chrome handgun at Rondell. Ronald stated he heard more than five gunshots and testified that defendant was "standing on the side" of the rear driver's-side door. Ronald recognized defendant but did not know his name. Defendant kept shooting as Rondell ran, jumped over a fence, and continued running toward a nearby Chase Bank parking lot.

¶ 5      Marcus Diggs jumped out of the car and ran toward a nearby McDonald's restaurant. As Ronald slid over to the driver's side of the backseat, defendant pointed the gun at him and pulled the trigger. The gun clicked but did not fire.

¶ 6      When defendant began running away, Ronald got out of the car and chased him for 5 to 10 feet. Ronald then turned to look for his brother and found him lying in the Chase Bank parking

lot one-half block away. Ronald saw the black Lexus drive through the Chase Bank parking lot with only the driver inside. Police officers later arrived, and Ronald overheard a message on a police radio that a Lexus had been stopped at a Walgreens store across the street from the bank. Ronald ran to the Walgreens store, recognized the Lexus, and yelled that the driver had killed his brother. Ronald testified at trial, however, that the driver was not the shooter and he did not see defendant in the Lexus when it was stopped at the Walgreens store.

¶ 7     Ronald further testified that a person from his neighborhood showed him a YouTube video a couple days after the shooting. Ronald recognized the black Lexus, the driver, and the shooter in the video, but he did not know their names. Ronald alerted the police to the video, and he subsequently identified defendant as the shooter from a lineup conducted eight days after the shooting. Ronald also identified defendant in court as the shooter.

¶ 8     Dexter Saffold testified that he was riding his scooter on the street in front of the gas station on the night of the shooting. He testified it was early evening and still light out. As he approached the gas station, he heard gunshots, stopped, and saw the shooter from about 18 feet away. Saffold identified defendant in court as the shooter. Saffold testified that defendant was holding a dark-colored handgun, he could see flashes coming from the muzzle, and he heard more than two gunshots. Defendant was pointing the gun at a person by a car with the hood up and another man on a bicycle near the car. After firing the handgun, defendant ran toward Saffold and bumped into him, almost dropping the gun while trying to put it in his pocket. Defendant ran behind Chase Bank and out of Saffold's view. Saffold also saw another person running "behind, you know, the alley, a fence or somewhere." As he went into the gas station to call 911, Saffold saw a man lying in the parking lot by the car and the bicycle. Eight days after the shooting, Saffold viewed a lineup and identified defendant as the shooter.

¶ 9     Quincy Woulard testified that he often helped people with car repairs at the gas station. He saw his friend Rondell Moore, known by his nickname "Blink," at the gas station with his car that was overheating. Woulard was looking under the hood of the car when he heard three gunshots and fell to the ground. He heard someone say, "he runnin [*sic*] down the alley," and he saw someone running there. Woulard was shot three times but testified he did not see who shot him.

¶ 10    Aaron Jones testified that he was driving the black Lexus and selling marijuana when defendant, known by Jones as "Slim" or "Chucky," asked him for a ride to the gas station. Jones drove defendant to the gas station and dropped him off. Jones testified that he then drove to his home six blocks away but came back to buy cigarettes at the Walgreens store across the street from Chase Bank. Jones testified he was stopped and arrested by police officers before he reached the Walgreens store. Later in his testimony, however, Jones recanted and stated defendant was never in his car, that police officers told him to identify defendant, and that the officers threatened him with life imprisonment if he did not testify as they wished.

¶ 11    Chicago police officer Richard Mostowski testified he received a call that a person had been shot and a black Lexus was leaving the scene. He stopped a black Lexus approximately two blocks from the gas station. After he stopped the car, a man approached and yelled "you killed my brother." The driver, later identified as Aaron Jones, was arrested and a search of his person revealed 11 small, plastic bags. The parties stipulated that the plastic bags contained a total of 10.6 grams of cannabis. There were no passengers in the car when it was stopped.

¶ 12 A surveillance video of the gas station parking lot showed a black male with what appears to be a blue towel around his neck walking into the store. During his testimony, Ronald Moore identified that person as his brother, Rondell Moore. The video shows Rondell Moore inside the store and then walking out of the store back to his car. The video later shows a black car entering the lot, a person getting out of the passenger side, and the car driving away. The passenger walked out of view of the camera toward the gas station store. A few seconds later, the video shows a person running through the parking lot and another person chasing him for a few feet before turning around and running in the opposite direction.

¶ 13 The parties stipulated that the medical examiner would have testified that Rondell Moore was shot three times in the back. There were two exit wounds, including one from a bullet that pierced Rondell's right lung and pulmonary artery. The third bullet lodged in his abdominal wall. The medical examiner determined the cause of death was multiple gunshot wounds.

¶ 14 The parties also stipulated that five fired bullets were recovered in the investigation. Forensic scientist Tracy Konier would have testified that two of the bullets were .380/.38-class caliber and were fired from the same firearm. Two of the bullets were 9 millimeter, .38-class caliber. They could not be identified or eliminated as having been fired from the same firearm as each other or as the .380/.38-class caliber bullets. The fifth bullet was a .22 caliber. The parties stipulated that four of the bullets were recovered from the gas station crime scene. The other one was recovered from Rondell Moore's abdominal wall.

¶ 15 The trial court relied heavily on Saffold's testimony in finding defendant guilty of murder, three counts of attempted murder, and aggravated battery. The trial judge stated "this case begins and ends with Mr. Saffold" and "[a]mong all the witnesses that I heard from, his testimony was unblemished by any of the cross-examination." The trial court observed that Saffold's testimony was also corroborated by the testimony of Ronald Moore and Jones and stated any minor inconsistencies in the testimony did not raise a doubt of defendant's guilt. The court concluded that this case "was not a particularly close one."

¶ 16 At sentencing, defendant offered evidence in mitigation, including that he did not have a prior criminal history, he obtained his general education diploma (GED) and several educational achievement certificates while in pretrial custody for these offenses, and he has a stable and supportive family. In sentencing defendant, the trial judge stated he had considered all the statutory sentencing factors and remarked, "This is a serious case. I am sorry that the sentencing parameters are such that my options are somewhat limited. Although, I do feel you should be treated seriously." The trial judge then sentenced defendant to 45 years' imprisonment for first degree murder (20 years for the offense plus 25 years for the mandatory firearm enhancement), 26 years for one count of attempted murder (6 years for the offense plus 20 years for the mandatory firearm enhancement), 31 years for each of the other two attempted murder convictions (6 years for the offense plus 25 years for the mandatory firearm enhancement), and 20 years for aggravated battery with a firearm. The attempted murder and aggravated battery sentences were ordered to run concurrently with each other, but the attempted murder sentences were required to be served consecutively to the murder sentence for an aggregate sentence of 76 years' imprisonment.

¶ 17 On appeal, defendant contended the evidence was insufficient to prove him guilty beyond a reasonable doubt of either first degree murder or attempted first degree murder. Defendant also challenged his aggregate 76-year prison sentence under both the eighth amendment to the

United States Constitution (U.S. Const., amend. VIII) and article I, section 11, of the Illinois Constitution (Ill. Const. 1970, art. I, § 11), commonly referred to as the proportionate penalties clause.

¶ 18    The appellate court held the evidence, viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to find the offenses proven beyond a reasonable doubt. 2016 IL App (1st) 141744, ¶¶ 17-29. The appellate court also rejected defendant's claim that his aggregate sentence violated the eighth amendment prohibition against cruel and unusual punishment. 2016 IL App (1st) 141744, ¶¶ 55-56. On the Illinois constitutional claim, however, the appellate court held defendant's aggregate sentence was contrary to the "rehabilitation clause" of article I, section 11, providing that penalties must be determined with " 'the objective of restoring the offender to useful citizenship.' " 2016 IL App (1st) 141744, ¶ 64 (quoting Ill. Const. 1970, art. I, § 11). The appellate court stated that "[w]hile we do not minimize the seriousness of [defendant's] crimes, we believe that it shocks the moral sense of the community to send this young adult to prison for the remainder of his life, with no chance to rehabilitate himself into a useful member of society." 2016 IL App (1st) 141744, ¶ 69. Accordingly, the appellate court vacated defendant's sentences. 2016 IL App (1st) 141744, ¶ 76. On the State's concession, the appellate court also directed the clerk to correct the mittimus to reflect only one conviction of attempted first degree murder because convictions for three separate counts violated the "one act, one crime" rule. 2016 IL App (1st) 141744, ¶¶ 74-75. Defendant's remaining convictions were affirmed, and the case was remanded for resentencing. 2016 IL App (1st) 141744, ¶ 76.

¶ 19    Justice Mason dissented from the portion of the decision holding defendant's aggregate 76-year sentence unconstitutional under the proportionate penalties clause of the Illinois Constitution. 2016 IL App (1st) 141744, ¶ 79 (Mason, J., concurring in part and dissenting in part). Relying on this court's decision in *People v. Thompson*, 2015 IL 118151, ¶¶ 37-39, the partial dissent maintained that defendant's as-applied challenge must be rejected because he failed to introduce evidence or develop the record necessary to support his claim in the trial court. 2016 IL App (1st) 141744, ¶ 80 (Mason, J., concurring in part and dissenting in part). The partial dissent would have also rejected defendant's claim based on the Illinois Constitution on the merits. 2016 IL App (1st) 141744, ¶¶ 81-87 (Mason, J., concurring in part and dissenting in part).

¶ 20    We allowed the State's petition for leave to appeal as a matter of right (Ill. S. Ct. R. 317 (eff. July 1, 2006)). We also allowed the Children and Family Justice Center, Chicago Lawyers' Committee for Civil Rights, Civitas ChildLaw Clinic, Criminal and Juvenile Justice Project Clinic, Juvenile Justice Initiative of Illinois, Juvenile Law Center, Law Office of the Cook County Public Defender, and the James B. Moran Center for Youth Advocacy to file a joint *amicus curiae* brief. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 21                                    II. ANALYSIS

¶ 22    On appeal to this court, the State contends that the appellate court erred in holding defendant's aggregate 76-year sentence unconstitutional under the proportionate penalties clause of the Illinois Constitution. Defendant cross-appeals, renewing his arguments that the State failed to prove him guilty beyond a reasonable doubt of Rondell Moore's murder and that

his mandatory 76-year sentence violates the eighth amendment prohibition against cruel and unusual punishment. We first consider defendant's cross-appeal claim challenging the sufficiency of the evidence. See *People v. Gray*, 2017 IL 120958, ¶ 31 (sufficiency of the evidence claim addressed before constitutional claims).

¶ 23                                    A. Sufficiency of the Evidence

¶ 24       Defendant maintains that Rondell Moore was shot in the Chase Bank parking lot and no witnesses or physical evidence tied him to that shooting. Defendant observes that the bullet recovered from Rondell Moore's body did not match the ones found at the gas station, there was no testimony that defendant had a second gun, and other people, including Aaron Jones, were seen in the bank parking lot. According to defendant, Rondell Moore could not have jumped a fence and run to the Chase Bank parking lot if he had been shot at the gas station. Defendant, therefore, concludes that the State failed to prove beyond a reasonable doubt that he shot and killed Rondell Moore.

¶ 25       The State responds that the evidence was sufficient to convict defendant of first degree murder. In fact, as the trial court observed, "[t]his case was not a particularly close one." Three witnesses placed defendant at the gas station, two of them positively identified defendant as the shooter, and the gas station surveillance video substantially corroborated the testimony of the witnesses. Based on the evidence, the trial judge reasonably concluded that defendant shot and killed Rondell Moore. The State contends defendant's arguments are based on pure conjecture and do not undermine the strong evidence establishing his guilt. Further, even if defendant's second-shooter theory were true, the State submits that he is accountable for the murder because the evidence would establish that defendant, Jones, and others made a plan to kill Rondell Moore and worked together to complete that plan.

¶ 26       When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether, " ' "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis in original.) *People v. Ross*, 229 Ill. 2d 255, 272 (2008) (quoting *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts. *Gray*, 2017 IL 120958, ¶ 35. The reviewing court does not retry the defendant and must draw all reasonable inferences in favor of the prosecution. *In re Q.P.*, 2015 IL 118569, ¶ 24. A conviction will not be reversed on appeal for insufficient evidence unless the evidence is so improbable or unsatisfactory that a reasonable doubt remains as to the defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 27       In this case, the evidence establishes clearly that defendant was the person who shot several times at Rondell Moore and Quincy Woulard as they were trying to fix Moore's car and as Moore fled. Aaron Jones testified that he dropped defendant off in the gas station parking lot. Ronald Moore and Dexter Saffold both identified defendant as the shooter in lineups and in court. This court has consistently held that the testimony of a single witness is sufficient to sustain a conviction if the testimony is positive and credible, even if it is contradicted by the defendant. *Gray*, 2017 IL 120958, ¶ 36; *Wright*, 2017 IL 119561, ¶¶ 76-77. The identification testimony of both Ronald Moore and Saffold was positive and credible. The trial court credited

Saffold's testimony in particular, stating "[a]mong all the witnesses that I heard from, his testimony was unblemished by any of the cross-examination." The testimony of Jones, Moore, and Saffold was also corroborated by the surveillance video of the gas station parking lot showing a person getting out of the passenger side of a black car and walking toward the gas station. The video later showed a person running through the parking lot with another person chasing him for a few feet and then turning around and running in the opposite direction. The testimony of the witnesses was consistent with the events shown in the surveillance video.

¶ 28     Defendant does not seriously dispute this part of the evidence, conceding in his brief that the evidence "arguably showed that [defendant] was the gas station shooter." Defendant instead claims the evidence does not establish that Rondell Moore was actually shot at the gas station but that he was shot and killed by someone else after running to the Chase Bank parking lot. In support of his claim, defendant argues that it defies common sense to believe Rondell Moore could have jumped over a fence that was several feet high and run to the Chase Bank parking lot if he had been shot three times at the gas station. Defendant also observes that the State did not present any evidence of Rondell Moore's blood between the gas station and the bank parking lot.

¶ 29     Conversely, no evidence suggests that Rondell Moore could not have jumped the fence and run to the Chase Bank parking lot after being shot. We cannot speculate about Moore's physical abilities while fleeing for his life. Additionally, it is not clear exactly when the bullets struck Rondell Moore given Ronald Moore's testimony that defendant continued to shoot as Rondell fled. One or more of the bullets may have hit Rondell Moore as he was jumping the fence or as he ran toward Chase Bank.

¶ 30     Further, although no evidence of a blood trail between the gas station and Chase Bank was offered, the parties stipulated that in processing the scene forensic investigators collected "a light blue bath towel with apparent blood." A photograph introduced into evidence showed what appears to be a light blue towel lying in the gas station parking lot near the fence. The surveillance video from the gas station showed Rondell Moore walking into and out of the store with a blue towel around his neck. The trial court could have inferred from this evidence that the towel found near the fence in the gas station parking lot was the one around Rondell Moore's neck and the blood on the towel was evidence that he was shot in the gas station parking lot.

¶ 31     Additionally, while the bullets recovered in the investigation were not all the same caliber, the evidence does not exclude defendant from firing more than one gun. As the appellate court observed, "there was nothing preventing [defendant] from carrying two firearms during the crime." We note that Ronald Moore testified defendant was firing a chrome handgun and Saffold testified he fired a dark-colored handgun and that he tried to put it in his pocket as he ran away. That testimony suggests defendant may have fired more than one handgun.

¶ 32     Most importantly, while defendant posits that Rondell Moore was shot and killed in the Chase Bank parking lot, no testimony or physical evidence indicates that any shots were fired there or anywhere other than the gas station parking lot. Ronald Moore testified that after chasing defendant for 5 to 10 feet he ran directly to the Chase Bank parking lot one-half block away from the gas station. He saw the black Lexus drive through that parking lot but did not testify that he heard any gunshots or saw anyone fire a gun there. The only evidence of gunshots being fired was by defendant in the gas station parking lot. All of the bullets

recovered in the investigation were from the gas station parking lot and from Rondell Moore's body. No evidence was presented that bullets or casings were found in the Chase Bank parking lot.

¶ 33 In contending Rondell Moore was shot and killed in the Chase Bank parking lot, defendant essentially asks this court to retry defendant on appeal. Of course, that is not this court's role. Our duty is to determine whether " ' "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis in original.) *Ross*, 229 Ill. 2d at 272 (quoting *Collins*, 106 Ill. 2d at 261, quoting *Jackson*, 443 U.S. at 319). In this case, a rational trier of fact could have concluded from the evidence that the shots fired by defendant struck Rondell Moore and caused his death from multiple gunshot wounds. We therefore agree with the appellate court that the evidence is sufficient to prove defendant guilty of Rondell Moore's murder beyond a reasonable doubt.

¶ 34             B. Proportionate Penalties Clause of the Illinois Constitution

¶ 35 The State contends that the appellate court made several errors in holding defendant's aggregate 76-year sentence unconstitutional under article I, section 11, of the Illinois Constitution, commonly referred to as the proportionate penalties clause. The State argues defendant forfeited his as-applied challenge by failing to raise it in the trial court. The State also contends the appellate court erred in considering the constitutional challenge because defendant failed to develop the factual and legal bases for his claim in the trial court. On the merits, the State maintains that defendant's mandatory minimum aggregate prison term does not violate the proportionate penalties clause because defendant has not demonstrated that, as applied to his circumstances, the sentence is so wholly disproportionate to his offenses that it shocks the moral sense of the community.

¶ 36 Defendant responds that as applied to him, the statutory sentencing scheme, resulting in a mandatory *de facto* life sentence, "violates the rehabilitation clause of [article I, section 11,] of the Illinois Constitution." Defendant contends that it shocks the moral sense of the community to impose a mandatory *de facto* life sentence given the facts of this case, including his youth and the other mitigating factors present. Defendant further argues that the State has forfeited its forfeiture argument by failing to raise it in the appellate court or in its petition for leave to appeal and that the record is sufficient to consider his constitutional challenge.

¶ 37 Defendant's claim is an as-applied challenge. Defendant contends that, as applied to his specific circumstances, the sentencing statutes resulting in a mandatory aggregate sentence of 76 years' imprisonment violate the Illinois Constitution. In particular, defendant relies on the United States Supreme Court's decisions in *Roper v. Simmons*, 543 U.S. 551, 578-79 (2005) (the eighth and fourteenth amendments prohibit capital sentences for juveniles who commit murder), *Graham v. Florida*, 560 U.S. 48, 82 (2010) (the eighth amendment prohibits mandatory life sentences for juveniles who commit nonhomicide offenses), and *Miller v. Alabama*, 567 U.S. 460, 489 (2012) (the eighth amendment prohibits mandatory life sentences for juveniles who commit murder), and claims the reasoning from those cases should be extended to his specific circumstances as an 18-year-old young adult.

¶ 38 The distinction between facial and as-applied constitutional challenges is critical. *People ex rel. Hartrich v. 2010 Harley-Davidson*, 2018 IL 121636, ¶ 11. A party raising a facial

challenge must establish that the statute is unconstitutional under any possible set of facts, while an as-applied challenge requires a showing that the statute is unconstitutional as it applies to the specific facts and circumstances of the challenging party. *Hartrich*, 2018 IL 121636, ¶ 12; *People v. Rizzo*, 2016 IL 118599, ¶ 24; *Thompson*, 2015 IL 118151, ¶ 36.

¶ 39   All as-applied constitutional challenges are, by definition, dependent on the specific facts and circumstances of the person raising the challenge. " 'Therefore, it is paramount that the record be sufficiently developed in terms of those facts and circumstances for purposes of appellate review.' " *Hartrich*, 2018 IL 121636, ¶ 31 (quoting *Thompson*, 2015 IL 118151, ¶ 37). We have reiterated that

> " ' "[a] court is not capable of making an 'as applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact. [Citation.] Without an evidentiary record, any finding that a statute is unconstitutional 'as applied' is premature." ' " *Rizzo*, 2016 IL 118599, ¶ 26 (quoting *People v. Mosley*, 2015 IL 115872, ¶ 47, quoting *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004)).

¶ 40   Here, defendant did not raise his as-applied constitutional challenge in the trial court. Thus, an evidentiary hearing was not held on his constitutional claim, and the trial court did not make any findings of fact on defendant's specific circumstances. The appellate court held defendant's sentence violated the Illinois Constitution without a developed evidentiary record on the as-applied constitutional challenge.

¶ 41   Defendant, nonetheless, contends our reasoning in *Thompson* does not apply here because *Thompson* involved a collateral proceeding and this case is on direct review. This court, however, has applied the concepts from *Thompson* to cases on direct review. See *Hartrich*, 2018 IL 121636, ¶¶ 8-9; *People v. Minnis*, 2016 IL 119563, ¶ 1; *Rizzo*, 2016 IL 118599, ¶ 1; *Mosley*, 2015 IL 115872, ¶ 1. The critical point is not whether the claim is raised on collateral review or direct review, but whether the record has been developed sufficiently to address the defendant's constitutional claim. As we have emphasized, a reviewing court is not capable of making an as-applied finding of unconstitutionality in the "factual vacuum" created by the absence of an evidentiary hearing and findings of fact by the trial court. *Minnis*, 2016 IL 119563, ¶ 19; *Rizzo*, 2016 IL 118599, ¶ 26.

¶ 42   Defendant also contends the record contains all the facts necessary to address his claim under the Illinois Constitution. Defendant observes that in *People v. Holman*, 2017 IL 120655, this court addressed the defendant's claim, raised for the first time on appeal, that his sentencing hearing did not comport with *Miller v. Alabama*, because all of the facts and circumstances to decide that claim were contained in the record. Defendant maintains that the record here includes sufficient information about his personal history to allow the court to consider whether the evolving science on juvenile maturity and brain development relied upon in *Miller* applies to him.

¶ 43   In *Holman*, the defendant argued for the first time on appeal from the denial of his *pro se* petition for leave to file a successive postconviction petition that his life sentence was unconstitutional under Supreme Court case law, particularly *Miller*. *Holman*, 2017 IL 120655, ¶ 20. This court acknowledged *Thompson* held that a defendant must present an as-applied constitutional challenge to the trial court to develop the record sufficiently. *Holman*, 2017 IL 120655, ¶ 32. The specific claim raised by the defendant in *Holman*, however, fell under a "very narrow exception" applicable when the record had been developed sufficiently for

appellate review of an as-applied *Miller* claim. *Holman*, 2017 IL 120655, ¶ 32. We held that the defendant's *Miller* claim "[did] not require factual development." *Holman*, 2017 IL 120655, ¶ 32. All of the facts and circumstances necessary to decide the defendant's *Miller* claim were already in the record. *Holman*, 2017 IL 120655, ¶ 32. Accordingly, we chose to address the merits of the defendant's claim in the interest of judicial economy. *Holman*, 2017 IL 120655, ¶ 32.

¶ 44  The "very narrow exception" recognized in *Holman* does not apply here, however. In *Holman*, the defendant was sentenced to life without parole for a murder he committed at age 17, and he argued that he was entitled to a new sentencing hearing under *Miller*. *Holman*, 2017 IL 120655, ¶ 1. As noted previously, *Miller* held that mandatory life sentences for juveniles who commit murder are prohibited under the eighth amendment prohibition against cruel and unusual punishment. *Holman*, 2017 IL 120655, ¶ 33. As a factual matter, the defendant in *Holman* fell squarely under *Miller* because he was a juvenile when his crime was committed. The critical determinations were purely legal issues: deciding whether *Miller* also applied to discretionary life sentences for juveniles and defining the *Miller* factors to be considered in sentencing. *Holman*, 2017 IL 120655, ¶¶ 33-46. The only other issue was determining from the "cold record" whether the trial court adequately considered the *Miller* factors at the original sentencing hearing. *Holman*, 2017 IL 120655, ¶¶ 47-50. Thus, the evidentiary record was sufficient to address the issues raised in *Holman*.

¶ 45  In contrast, defendant in this case was 18 years old at the time of his offenses. Because defendant was an adult, *Miller* does not apply directly to his circumstances. The record must be developed sufficiently to address defendant's claim that *Miller* applies to his particular circumstances. As we stated in *Holman*,

"The defendant's claim in *Thompson* illustrated that point. The defendant there maintained that the evolving science on juvenile maturity and brain development highlighted in *Miller* applied not only to juveniles but also to young adults like himself between the ages of 18 and 21. [Citation.] We rejected that claim because the record contained 'nothing about how that science applies to the circumstances of defendant's case, the key showing for an as-applied constitutional challenge.' [Citation.] We stated the trial court was the most appropriate tribunal for such factual development." *Holman*, 2017 IL 120655, ¶ 30.

¶ 46  Defendant contends that the record includes sufficient information about his personal history to determine whether the evolving science on juvenile maturity and brain development applies to him. The record, however, includes only basic information about defendant, primarily from the presentence investigation report. An evidentiary hearing was not held, and the trial court did not make any findings on the critical facts needed to determine whether *Miller* applies to defendant as an adult. As in *Thompson*, the record here does not contain evidence about how the evolving science on juvenile maturity and brain development that helped form the basis for the *Miller* decision applies to defendant's specific facts and circumstances. Accordingly, defendant's as-applied challenge is premature. See *Rizzo*, 2016 IL 118599, ¶ 26.

¶ 47  Finally, defendant asserts that if this court determines further development of the record is necessary to address his constitutional claim we should remand to the trial court for an evidentiary hearing while retaining jurisdiction. The State responds that we should reject

defendant's request because he had adequate opportunity to develop his claim in the trial court. The State notes that defendant was sentenced two years after the Supreme Court decided *Miller* and that the principle requiring a litigant to develop the evidentiary record for an as-applied constitutional challenge is well established.

¶ 48    In addressing a similar claim in *Thompson*, we observed that the defendant was not necessarily foreclosed from raising his as-applied challenge in another proceeding. We noted that the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2016)) is designed to resolve constitutional issues and the defendant's claim could also potentially be raised in a petition seeking relief from a final judgment under section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)). *Thompson*, 2015 IL 118151, ¶ 44. The Post-Conviction Hearing Act specifically allows for raising " 'constitutional questions which, by their nature, depend[ ] upon facts not found in the record.' " *People v. Cherry*, 2016 IL 118728, ¶ 33 (quoting *People v. Thomas*, 38 Ill. 2d 321, 324 (1967)). In *Cherry*, this court observed that claims of ineffective assistance of counsel are commonly raised in postconviction proceedings because they often require presentation of evidence not contained in the record. *Cherry*, 2016 IL 118728, ¶ 33. We believe defendant's claim is also more appropriately raised in another proceeding. Accordingly, we decline to remand this matter for an evidentiary hearing.

¶ 49                                    C. Eighth Amendment

¶ 50    Finally, on cross-appeal defendant renews his claim based on the eighth amendment. Defendant contends that, given "the emerging scientific consensus on the ongoing neurological development of young adults," sentencing individuals under the age of 21 to mandatory life imprisonment violates the eighth amendment prohibition against cruel and unusual punishment. Defendant asserts that evidence shows the brains of young adults continue to develop into their mid-twenties, and he urges this court to "not wait for the United States Supreme Court to extend the bright line rule of *Miller* to young adults ages 18 to 21."

¶ 51    The State responds that, even if the qualities of youth do not necessarily disappear when a person reaches 18 years of age, both society and the constitution draw the line distinguishing children from adults at age 18. The State maintains that the scientific research on this subject "is in its infancy" and it is impossible to identify a precise age when the characteristics of youth cease in either an individual or the general population. Further, the constitutional line for sentencing is based primarily on the traditional recognition of the special status of juveniles rather than on emerging scientific research. The State, therefore, concludes that the legislature is within its constitutional authority to define adulthood at the age of 18 for the purpose of sentencing.

¶ 52    As noted previously, facial and as-applied constitutional challenges are not interchangeable. An as-applied challenge requires a showing that the statute is unconstitutional as it applies to the challenging party's specific circumstances. *Thompson*, 2015 IL 118151, ¶ 36. In contrast, a facial challenge requires the challenging party to establish that the statute is unconstitutional under any possible set of facts. *Thompson*, 2015 IL 118151, ¶ 36.

¶ 53    Defendant's claim is a facial challenge. He does not rely on his particular circumstances in challenging his sentence under the eighth amendment but, rather, contends that the eighth amendment protection for juveniles recognized in *Miller* should be extended to all young

adults under the age of 21. At oral argument, defendant confirmed that he sought a categorical ruling extending *Miller* to all young adults under age 21. To the extent that defendant may have intended to raise an as-applied challenge under the eighth amendment, that claim would fail for the same reason his challenge under the Illinois Constitution failed, because no evidentiary hearing was held and no findings of fact were entered on how *Miller* applies to him as a young adult.

¶ 54    Here, the appellate court rejected defendant's eighth amendment constitutional challenge. 2016 IL App (1st) 141744, ¶ 56. The appellate court observed that in *Roper*, *Graham*, and *Miller*, the Supreme Court "drew a line between juveniles and adults at the age of 18 years." 2016 IL App (1st) 141744, ¶ 56. The appellate court held defendant's eighth amendment claim fails because he "falls on the adult side of that line." 2016 IL App (1st) 141744, ¶ 56. We agree.

¶ 55    In *Roper* and *Graham*, the Supreme Court established that "children are constitutionally different from adults for purposes of sentencing" in several important ways. *Miller*, 567 U.S. at 471. First, children are less mature and have an underdeveloped sense of responsibility, leading to recklessness, impulsive behavior, and heedless risk-taking. *Miller*, 567 U.S. at 471 (citing *Roper*, 543 U.S. at 569). Second, children are more vulnerable to negative influences and pressures, including from their family and peers. *Miller*, 567 U.S. at 471 (citing *Roper*, 543 U.S. at 569). And third, a child's character is less fixed, making his or her actions less likely to be indicative of irretrievable depravity. *Miller*, 567 U.S. at 471 (citing *Roper*, 543 U.S. at 570). Those differences between adults and juveniles diminish a juvenile's moral culpability and result in increased prospects for reform. *Miller*, 567 U.S. at 471-73. The *Miller* Court, therefore, held that a sentencing scheme mandating life in prison without the possibility of parole for juvenile offenders violates the eighth amendment prohibition on cruel and unusual punishment. *Miller*, 567 U.S. at 479.

¶ 56    In *Roper*, *Graham*, and *Miller*, the Supreme Court "unmistakably instructed that youth matters in sentencing." *Holman*, 2017 IL 120655, ¶ 33. The *Miller* Court "identified a foundational principle that 'imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children.' " *Holman*, 2017 IL 120655, ¶ 35 (quoting *Miller*, 567 U.S. at 474). The Supreme Court has never extended its reasoning to young adults age 18 or over. Rather, the Supreme Court defined juveniles as individuals under the age of 18. Specifically, in holding that the eighth amendment prohibits imposing the death penalty on juvenile offenders, the *Roper* Court recognized that:

"Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules. The qualities that distinguish juveniles from adults do not disappear when an individual turns 18. By the same token, some under 18 have already attained a level of maturity some adults will never reach. For the reasons we have discussed, however, a line must be drawn. *** The age of 18 is the point where society draws the line for many purposes between childhood and adulthood. It is, we conclude, the age at which the line for death eligibility ought to rest." *Roper*, 543 U.S. at 574.

¶ 57    In *Graham*, the Court again noted the "fundamental differences between juvenile and adult minds" and reiterated that juveniles are "more capable of change than are adults." *Graham*, 560 U.S. at 68. The Court held:

"[A] clear line is necessary to prevent the possibility that life without parole sentences will be imposed on juvenile nonhomicide offenders who are not sufficiently culpable to merit that punishment. Because '[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood,' those who were below that age when the offense was committed may not be sentenced to life without parole for a nonhomicide crime." *Graham*, 560 U.S. at 74-75 (citing Roper, 543 U.S. at 574).

¶ 58 In *Miller*, the Court again confirmed that the age of 18 is the legal line separating adults from juveniles, holding that "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " *Miller*, 567 U.S. at 465. Thus, the Supreme Court has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18.

¶ 59 Defendant argues that emerging scientific research on the neurological development of young adults supports extending *Miller* to adults under the age of 21. Defendant acknowledges that "this brain research is new." The State contends the scientific research is inconclusive, citing various articles. The State asserts that "the neuroscientific and legal communities continue to debate the limitations of neuroimaging and its implications for criminal justice and other areas of the law." Again, we note that an evidentiary hearing was not held and the trial court did not make any findings of fact on this subject.

¶ 60 In any case, the line drawn by the Supreme Court at age 18 was not based primarily on scientific research. The Supreme Court acknowledged its line at age 18 was an imprecise "categorical rule[ ]" but emphasized that "a line must be drawn." *Roper*, 543 U.S. at 574. The Court drew the line at age 18 because that "is the point where society draws the line for many purposes between childhood and adulthood." *Roper*, 543 U.S. at 574. New research findings do not necessarily alter that traditional line between adults and juveniles.

¶ 61 Finally, we note that claims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected. See, *e.g.*, *United States v. Williston*, 862 F.3d 1023, 1039-40 (10th Cir. 2017) (declining to expand the holding of *Miller* to offenders who are " 'just over age 18' " at the time of their offenses); *United States v. Marshall*, 736 F.3d 492, 500 (6th Cir. 2013) (for eighth amendment purposes, an individual's eighteenth birthday marks the bright line separating juveniles from adults); *People v. Argeta*, 149 Cal. Rptr. 243, 245-46 (Ct. App. 2012) (rejecting argument to extend *Miller* to an offender who was 18 years, 5 months, old at the time of his offense). We agree with those decisions and our appellate court that, for sentencing purposes, the age of 18 marks the present line between juveniles and adults. As an 18-year-old, defendant falls on the adult side of that line. Accordingly, defendant's facial challenge to his aggregate sentence under the eighth amendment necessarily fails.

¶ 62                                    III. CONCLUSION

¶ 63 For the above reasons, we reverse the appellate court's judgment vacating defendant's sentences and remanding for resentencing. The appellate court's judgment is otherwise affirmed.

¶ 64 Appellate court judgment affirmed in part and reversed in part.

¶ 65     JUSTICE BURKE, specially concurring:

¶ 66     I agree with the majority's holding that the evidence in this case is sufficient to support defendant's convictions. I also agree with the majority's holding that sentencing defendant to an aggregate term of 76 years' imprisonment does not violate the eighth amendment. However, I disagree with the majority's decision not to address defendant's argument that sentencing him to a 76-year term violates article I, section 11, of the Illinois Constitution of 1970.

¶ 67     Article I, section 11, of the Illinois Constitution of 1970 provides, in relevant part, that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The defendant's claim under this provision is described by the majority as being focused on the particular circumstances of his case. The majority notes that defendant has emphasized his age at the time of the offenses, 18 years and 3 months, and has argued that, because of mitigating factors in his personal history and potential for rehabilitation, he should receive a sentence that is less than the aggregate, 76-year term he was given. *Supra* ¶ 37. From this, the majority concludes that defendant's constitutional claim is an "as-applied" challenge to his sentence. *Supra* ¶ 37. The majority then observes that an as-applied challenge is "dependent on the specific facts and circumstances of the person raising the challenge" (*supra* ¶ 39) and that, in this case, the trial court did not hold an evidentiary hearing on defendant's constitutional claim and "did not make any findings of fact on defendant's specific circumstances" (*supra* ¶ 40). Accordingly, the majority holds that defendant's constitutional claim is premature and, therefore, the appellate court erred in reaching the merits of the claim. *Supra* ¶¶ 41-46. The majority reverses the appellate court's judgment vacating defendant's sentence but ultimately expresses no opinion on the merits of defendant's constitutional claim. Instead, the majority suggests that the claim would more properly be brought in a postconviction petition. *Supra* ¶ 48. I disagree.

¶ 68     The relevant language of article I, section 11, which is generally referred to as the proportionate penalties clause, governs the actions of both the judiciary and the legislature. *People v. Clemons*, 2012 IL 107821, ¶ 29. Thus, a trial court may not impose a sentence that, although within a sentencing range set by the legislature, is nevertheless unconstitutionally disproportionate for an individual defendant (*People v. Taylor*, 102 Ill. 2d 201, 206 (1984)), nor may the legislature enact a mandatory minimum sentence that is unconstitutionally disproportionate to a statutory offense (*Clemons*, 2012 IL 107821, ¶ 30).

¶ 69     The nature of a defendant's proportionate penalties clause claim will vary depending on whether the challenge is made to a sentence imposed by a trial court that is toward the maximum end of a sentencing range or whether the challenge is made to a minimum sentence mandated by the legislature. A sentence at the maximum end of a sentencing range is imposed after the trial court has exercised its discretion and concluded that the lower sentencing options provided by the legislature are inappropriate. Thus, a constitutional challenge to such a sentence is necessarily directed at the actions of the trial court, not the legislature. The claim will allege that, at sentencing, the trial court failed to properly weigh and apply the unique mitigating circumstances of the defendant's case, including the defendant's potential for rehabilitation, and that this failure resulted in an unconstitutionally disproportionate sentence. Because such a challenge alleges that the constitutional violation occurred at the time the trial court applied the sentencing statute, a proportionate penalties claim brought against a sentence

that is toward the maximum end of a sentencing range is typically labeled an "as-applied" challenge. If the defendant's claim is successful on appeal, the remedy lies in remanding the matter to the trial court with instructions to reapply the sentencing statute and impose a lesser sentence that is within the permissible sentencing range.

¶ 70　　The analysis differs when a defendant challenges a mandatory minimum sentence. A trial court exercises no discretion when imposing a mandatory minimum sentence. Thus, a constitutional claim brought against a mandatory minimum sentence will necessarily allege that the constitutional violation was committed, not by the trial court, but by the legislature when it enacted the legislation that mandated the sentence. Because a constitutional violation committed by the legislature is inherent "in the terms of the statute itself" (*One 1998 GMC*, 2011 IL 110236, ¶ 86 (Karmeier, J., specially concurring)), a constitutional claim brought against a mandatory minimum sentence is typically labelled a "facial" challenge. See Nicholas Q. Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209, 1236 (2010) ("It makes no sense to speak of 'as-applied' challenges to legislative actions, because the challenged action is complete before the application begins."). If the defendant's challenge to a mandatory minimum sentence is successful, the remedy lies with the legislature, which must amend the sentencing statute to remove the constitutional violation.

¶ 71　　In this case, defendant's proportionate penalties claim is a facial challenge. As defendant himself observes, the trial court exercised no discretion in imposing an aggregate, 76-year term of imprisonment. The 20-year term defendant received for the murder of Rondell Moore and the 6-year term defendant received for the attempted murder of Quincy Woolard were both statutory minimums mandated by the legislature. See 730 ILCS 5/5-4.5-20(a) (West 2012); 720 ILCS 5/8-4(c)(1) (West 2012); 730 ILCS 5/5-4.5-25(a) (West 2012). The 25-year firearm enhancements defendant received for each offense and the imposition of consecutive sentencing were also mandated by the legislature. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2012); 720 ILCS 5/8-4(c)(1)(D); 730 ILCS 5/5-8-4(d)(1) (West 2012). Thus, if there was a constitutional violation in this case, it was necessarily committed by the legislature, not the trial court. And if the violation was committed by the legislature, then it had to have been committed at the time the sentencing statutes were enacted, not the time they were applied. Defendant's claim cannot be an as-applied challenge.

¶ 72　　Moreover, defendant's constitutional claim is not, in fact, reliant on the specific circumstances of his particular case. Defendant's argument is focused on the lack of discretion afforded the trial court by the legislature. Defendant observes that it was the "confluence of the operative sentencing statutes *** that combined to produce [defendant's] mandatory 76-year minimum sentence of *de facto* life imprisonment." According to defendant, "this mandatory sentencing scheme is shocking in light of evolving standards of decency." Citing *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567 U.S. 460 (2012), defendant maintains there is "a clear trend in the jurisprudence of this country, grounded in ever-accumulating scientific evidence, towards more leniency and sentencing discretion in cases involving young offenders." Defendant acknowledges that the holdings of *Roper*, *Graham*, and *Miller* were limited to offenders younger than 18 but contends there is now a "wealth of further research in neurobiology and developmental psychology" showing that, even into their early twenties, "young offenders are more similar to adolescents than fully mature adults." Given this, defendant argues that it "shocks the moral sense of the community" for the legislature to prohibit a trial court from exercising sentencing discretion

- 15 -

before imposing a natural or *de facto* life term for any offender, including himself, who is younger than 21. In short, defendant's contention is that the legislature violated the proportionate penalties clause when it enacted a sentencing scheme that mandates a natural or *de facto* life sentence for offenders under the age of 21.

¶ 73 Defendant's constitutional claim is in no way limited to, or dependent on, the facts of his particular case. If defendant's argument is correct, this would mean that sentencing *any* offender younger than 21 to a mandatory life sentence for *any* crime would be unconstitutional. Defendant's constitutional claim is directed toward the mandatory sentencing scheme itself. It is, therefore, a facial challenge.

¶ 74 To be sure, defendant does describe his personal circumstances and history in his brief and does maintain that he possesses an individual capacity "for reform and rehabilitation." But none of this personal information is relevant to defendant's constitutional claim. Under the present statutory scheme, the trial court does not have the discretion to consider any of the unique circumstances of defendant's case. Only if the trial court was granted the discretion to impose a lesser sentence and the cause was then remanded for resentencing would defendant's personal history become relevant. And the only way that the trial court could possess such discretion would be if this court were to first agree with defendant's claim that the legislature violated the constitution when it enacted a legislative scheme that results in a mandatory *de facto* life sentence for all offenders under the age of 21. Again, this is a facial challenge to the constitutionality of the legislature's actions.

¶ 75 In light of the foregoing, it is clear that the majority, in holding that defendant's constitutional claim is an as-applied challenge, has improperly conflated two completely different questions: (1) whether the legislature may enact a sentencing scheme that mandates a natural or *de facto* life sentence for offenders under 21 and, (2) if they may not, whether defendant is entitled to the exercise of the trial court's sentencing discretion in this case to receive a sentence of less than 76 years' imprisonment. The majority's confusion regarding these two distinct questions leads it to conclude that, because the trial court did not make "findings of fact on defendant's specific circumstances" (*supra* ¶ 40) and because we do not know whether defendant personally deserves the exercise of sentencing discretion, we cannot decide his facial challenge to the legislature's mandatory sentencing scheme. This is clearly incorrect.

¶ 76 Finally, the majority compounds its error, and contradicts its own analysis, when it addresses defendant's eighth amendment claim. Although the governing provisions are different, the nature of defendant's claims under both the Illinois and United States Constitutions are the same. Defendant cites the same authorities for both claims, *Roper*, *Graham*, and *Miller*, and makes the same assertion under both, that the legislature may not enact a sentencing scheme that results in a mandatory natural or *de facto* life sentence for offenders under the age of 21. Yet the majority treats the two claims as if they were completely different, concluding that the first claim is an as-applied challenge and the second a facial one. *Supra* ¶¶ 37, 53. The majority offers no explanation for this discrepancy. Nor does the majority offer any explanation as to why the lack of an adequate record regarding defendant's personal circumstances makes it impossible to address defendant's proportionate penalties clause claim but presents no bar whatsoever to addressing his eighth amendment claim.

¶ 77    Because defendant's constitutional challenge to his legislatively mandated term of imprisonment is a facial one, there is no *per se* reason why we cannot address it. On the merits, I would reject defendant's proportionate penalties claim for the same reasons the majority rejects defendant's eighth amendment claim. As the majority notes, although scientific studies regarding brain development may help in determining where the line between juveniles and adults should be drawn for purposes of criminal sentencing, the issue is not one that can be resolved with scientific certainty based "primarily on scientific research." *Supra* ¶ 60. Rather, determining the age at which human beings should be held fully responsible for their criminal conduct is ultimately a matter of social policy that rests on the community's moral sense. Traditionally, 18 is the age at which the line has been drawn between juveniles and adults. *Supra* ¶ 56 (age 18 " 'is the point where society draws the line for many purposes between childhood and adulthood' " (quoting *Roper*, 543 U.S. at 574)). I cannot say that, for purposes of criminal sentencing, the Illinois Constitution prohibits the General Assembly from maintaining this traditional line. And since defendant does not otherwise argue that sentencing an adult offender to a mandatory 76-year term of imprisonment for the offenses at issue here violates the proportionate penalties clause, defendant's facial challenge fails. For these reasons, I would reverse the judgment of the appellate court vacating defendant's sentences and remanding for resentencing.

¶ 78    JUSTICE NEVILLE took no part in the consideration or decision of this case.