NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 190060-U

NO. 4-19-0060

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 9, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| NATHANDRE VINCENT CAMPBELL, | ) | No. 16CF992 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Scott D. Drazewski, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Turner concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the State presented sufficient evidence to sustain defendant's conviction for being an armed habitual criminal.

¶ 2    Following a jury trial, defendant, Nathandre Vincent Campbell, was convicted of being an armed habitual criminal and sentenced to 17 years in prison. Defendant appeals, arguing the State failed to prove him guilty beyond a reasonable doubt. We affirm.

¶ 3                    I. BACKGROUND

¶ 4                    A. Indictment

¶ 5    In September 2016, the State charged defendant by indictment with various criminal offenses based upon his alleged unlawful possession of a firearm. Ultimately, the State proceeded against defendant on one count of being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2014)), alleging defendant, on or about September 3, 2016, knowingly possessed

a firearm after having been convicted of the forcible felonies of burglary in McLean County case No. 92-CF-0672 and armed robbery in McLean County case No. 97-CF-0731.

¶ 6                                            B. Jury Trial

¶ 7            In October 2018, the trial court conducted a jury trial. The following is a summary of the testimony and evidence presented.

¶ 8                                            1. *Chris Payton*

¶ 9            Chris Payton (Chris) testified, on the morning of September 3, 2016, he went to a motel to check on his wife, Maria Payton (Maria), who had been staying at the motel. Chris testified Maria struggled with depression and he would occasionally secure a motel room to allow her time to "get her mind right."

¶ 10           Upon arriving at the motel, Chris knocked on Maria's upstairs motel room door. When Maria answered, Chris observed two other people inside Maria's room, one of whom he recognized as defendant. Chris told Maria he had purchased the motel room only for her, and the two of them then went outside and down the stairs to talk in the motel parking lot.

¶ 11           During his conversation with Maria, Chris observed defendant walking to his vehicle and then opening the vehicle door and reaching in. Defendant then approached Chris and Maria. When defendant was about six feet away, Chris observed a gun in defendant's hand. An argument then transpired between Chris and defendant concerning each other's presence and involvement with Maria. During the argument, defendant pointed the gun at Chris, to which Chris told defendant he was not afraid of any gun. Maria then tried to pull defendant back towards the motel. Chris told defendant he was going to call the police and then went and had the motel attendant call the police. After waiting with the attendant for about a minute, Chris observed defendant coming "[d]own some stairs." He was not sure where defendant came from. After police

- 2 -

officers arrived at the motel, Chris described to the officers what had occurred and then left when he was permitted to do so.

¶ 12          Chris testified the gun he observed was smaller in size and had a chrome end. Chris further testified Maria moved back in with him approximately a week or two after the incident.

¶ 13          On cross-examination, Chris testified he heard defendant "cock[ ] the gun" when defendant was walking towards him. Chris denied ever seeing Maria in possession of the gun. Chris testified he and Maria had been separated for about two to three months at the time of the incident. Chris noted he and Maria had previous issues in their marriage but Maria would always come back to him. As to his familiarity with defendant, Chris testified about previously helping defendant and defendant's girlfriend move. When asked if defendant was dating Maria at the time of the incident, Chris testified, "If you want to call it that." Chris acknowledged a previous incident where he went to retrieve his truck from Maria after he learned she wanted to be with defendant. Chris also acknowledged having a "tracking app" on Maria's cell phone. He asserted the tracking app was installed on the family phones to allow him, Maria, and their kids to be able to find each other. Chris testified he never had a confrontation with Maria and defendant at an address on Mulberry Street.

¶ 14                    *2. Police Officer Josh Wilson*

¶ 15          Police officer Josh Wilson testified, around 10:15 a.m. on September 3, 2016, he responded to the motel. With defendant's consent, Officer Wilson searched defendant's vehicle. No gun was discovered. Officer Wilson then secured the motel room which was rented by Maria. After a search warrant was secured, Officer Wilson and other officers executed the warrant on the room. Inside, officers discovered a pair of pants in a laundry basket. The pants had mail addressed to defendant in the back left pocket. A pistol was also discovered inside in the bathroom. Officer

Wilson assisted with securing the pistol. He described the pistol as having a slide which could be pulled backwards to load a bullet into the chamber. Officer Wilson testified pulling the slide backwards would make a distinct mechanical sound. When securing the pistol, Officer Wilson observed bullets in the magazine but not in the chamber. Officer Wilson acknowledged a bullet loaded into the chamber could be removed by pulling the slide backwards. On cross-examination, Officer Wilson acknowledged a search warrant was sought only after Maria denied the request to search the motel room.

¶ 16                              3. *Police Officer Andrew Rippy*

¶ 17            Police officer Andrew Rippy testified, around 10:15 a.m. on September 3, 2016, he responded to the motel. Officer Rippy spoke with Chris and Maria. Based on those conversations, he, along with other officers, began searching outside the motel for a pistol, which was described as a silver, semi-automatic pistol. No pistol or bullets were discovered. He then applied for and obtained a warrant to search the motel room where Maria and defendant were staying. Upon executing the warrant, Officer Rippy went into the bathroom, at which time he noticed the bathtub had debris inside of it which appeared to be dry insulation. He noticed the bathroom had a drop ceiling with panels which could be removed. Officer Rippy stood on the bathtub to investigate the space above the ceiling panels. He discovered a white motel towel, which appeared to have something inside of it. Officer Rippy took a photograph of the towel, which was admitted into evidence and published to the jury. Officer Rippy removed the towel from the ceiling and discovered within it a silver, semi-automatic pistol. Four bullets were inside the pistol's magazine. The pistol was admitted into evidence and shown to the jury. On cross-examination, Officer Rippy acknowledged the pistol was not tested for fingerprints.

¶ 18                              4. *Police Officer Melissa Zabukovec*

¶ 19　　　　　Police officer Melissa Zabukovec testified, around 10:15 a.m. on September 3, 2016, she responded to the motel. She spoke with Chris, who reported defendant had pulled a gun on him. She then spoke with defendant, who reported Chris and Maria were arguing in the parking lot, he went to his vehicle to charge his phone, and he did not have a gun or point one at Chris. Later that day, Officer Zabukovec had another conversation with defendant at the police station, which was audio and video recorded. On cross-examination, Officer Zabukovec acknowledged only Chris reported seeing defendant pull a gun. She also acknowledged no bullets were discovered outside of the pistol's magazine. Officer Zabukovec agreed defendant was very agreeable during the recorded interview. Officer Zabukovec did not believe she mentioned finding the gun in the ceiling during her conversation with defendant at the motel.

¶ 20　　　　　　　　　　5. *Recorded Police Interview*

¶ 21　　　　　The audio- and video-recorded police interview was admitted into evidence. A portion of the recording was published to the jury. The recording begins with Officer Zabukovec recounting defendant's statement at the motel indicating he did not have a gun. She then informed defendant a gun was found inside the motel room. Defendant denied knowing anything about the gun. He then asked for some time to himself, which Officer Zabukovec allowed and left the interview room.

¶ 22　　　　　A few minutes later, Officer Zabukovec returned to the interview room. After her return, defendant volunteered that the gun was his. Defendant stated he had the gun in his pocket when he went outside and did not get it from his vehicle. Defendant maintained he did not pull the gun on Chris. He volunteered Chris "just seen it in my pocket." Defendant explained he "pulled it out," showed it to Chris, and then put it back in his pocket. Defendant asserted he did not load a bullet into the chamber of the gun.

¶ 23    Defendant volunteered he hid the gun in the ceiling of the motel room the day prior to the incident. Officer Zabukovec then asked if it was hidden in the "main part of the room," to which defendant responded in the affirmative. She then asked how the gun got back into the room after it was in his pocket, to which defendant stated he put it back in the room. After being asked where he hid the gun, defendant stated, "A variety of places." Defendant then agreed with Officer Zabukovec's statement indicating he hid it in the ceiling. Defendant volunteered his fingerprints would be on the gun.

¶ 24    After Officer Zabukovec asked if the gun was stolen, defendant reported he purchased it on the street. She then asked if it was purchased in Chicago, to which defendant quickly agreed, or St. Louis, to which defendant again quickly agreed. Officer Zabukovec asked again if the gun was purchased in Chicago, to which defendant agreed.

¶ 25    At multiple points throughout the short interview, defendant asserted Maria did not know anything about the gun and told Officer Zabukovec not to allow Maria to take blame for the gun. Defendant also noted Maria was sick and had brain cancer and he did not want her to suffer.

¶ 26    Towards the end of the interview, defendant agreed with having his other girlfriend take his property after he was transferred to the jail.

¶ 27                        6. *Defendant's Prior Convictions*

¶ 28    The State moved for court to take judicial notice of defendant's prior convictions of burglary in McLean County case No. 92-CF-0672 and armed robbery in McLean County case No. 97-CF-0731, which the court granted over no objection. The jury was informed of the court's notice of defendant's convictions.

¶ 29                        7. *Defendant*

¶ 30    Defendant testified on his own behalf. Defendant initially acknowledged his prior

burglary and armed robbery convictions, noting they occurred when he was, respectively, 19 years old and 24 years old.

¶ 31 Defendant testified about his relationship with Maria. In September 2016, they had been dating for about a year and a half and were in love. Defendant asserted Maria had been separated from Chris at that point for almost two years. Defendant described the various activities he and Maria would do together. He noted Maria had been diagnosed with brain cancer and he would help take her to her medical appointments.

¶ 32 Defendant testified about prior incidents involving himself, Maria, and Chris. During an incident which occurred on Mulberry Street, Chris showed up angry about the fact Maria had been with defendant. Chris argued with Maria, after which defendant told Chris he had to leave. The police were called, but no one was arrested. A week after that incident, defendant discovered Chris had a tracking device on Maria's cell phone. Defendant indicated there were several instances where Chris would show up at places where defendant and Maria were present.

¶ 33 With respect to the September 2016 incident, defendant testified Chris showed up at the motel where defendant and Maria had been staying for about a week. Defendant heard a knock on the door, which Maria answered, and then saw Chris. After Chris tried to force himself into the motel room, Maria went outside to speak with Chris. Defendant noted only he and Maria were in the motel room.

¶ 34 Defendant exited the motel room shortly after Maria and found Chris and Maria arguing loudly outside. Defendant went to his vehicle to grab a battery pack for his cell phone and then sat on his vehicle and listened to the argument. Eventually, defendant walked over to Chris and Maria and told Maria they had to leave, to which Chris told defendant to get out of his face as he was talking to his wife. Defendant then confronted Chris about showing up to places where he

and Maria were present, to which Chris responded he was paying for the motel room so he could do as he pleased. After further argument, Maria tried to pull defendant away from Chris. Eventually, Chris told defendant he was tired of defendant's involvement with his wife and defendant was going to jail. Chris then walked to the motel lobby, and defendant waited outside for the police.

¶ 35 Defendant testified the gun found in the motel room belonged to Maria. According to defendant, Maria received the gun from Chris for her protection. Defendant testified he never possessed Maria's gun. Defendant further testified his assertions to the police to the contrary were his attempt to protect Maria because she was sick. Defendant asserted he asked for time to himself during his police interview to come up with a story to protect Maria. He then attempted to hurry along the interview by being agreeable. Defendant testified Officer Zabukovec told him at the motel that an officer found a gun located in the ceiling of the motel room. Defendant testified he spoke with Maria at the end of his police interview and tried to convey to her not to say anything as he was taking the blame for the gun.

¶ 36 On cross-examination, defendant was asked about his volunteered statement during his police interview in which he indicated Chris saw the gun in his pocket, to which defendant testified he was saying anything he could to assure Maria would not go to jail. Defendant acknowledged he did not disclose during the interview that he was sitting on his vehicle and listening to the argument between Chris and Maria or that Chris told him he was going to jail.

¶ 37 8. *Police-Recorded Interview*

¶ 38 The defense played for the jury the end of defendant's police interview. The recording ends with defendant asking to talk to Maria before he is transferred to the jail, which the police officers allowed. Once Maria is in the room, defendant, while attempting to console the

weeping Maria, tells Maria, "You didn't do nothing wrong. That's mine."

¶ 39                                    9. *Jury Verdict*

¶ 40         After a lengthy deliberation during which the recording of defendant's police interview was played again by request, the jury returned a verdict finding defendant guilty of being an armed habitual criminal.

¶ 41                            C. Posttrial Proceedings

¶ 42         In November 2018, defendant filed a posttrial motion arguing, in part, the State failed to prove him guilty beyond a reasonable doubt. The trial court denied defendant's motion and then proceeded to sentencing. Based upon the evidence and recommendations presented, the court sentenced defendant to 17 years in prison. Defendant later filed a motion to reconsider his sentence, which the court denied after a hearing.

¶ 43         This appeal followed.

¶ 44                                    II. ANALYSIS

¶ 45         On appeal, defendant argues the State failed to prove him guilty beyond a reasonable doubt of being an armed habitual criminal. The State disagrees.

¶ 46         When presented with a challenge to the sufficiency of the evidence, the question before this court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis and internal quotation marks omitted.) *People v. Harris*, 2018 IL 121932, ¶ 26, 120 N.E.3d 900. We must "not substitute [our] judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. "A criminal conviction will not be reversed for

insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *Id.*

¶ 47　　　　The State charged defendant with committing the offense of being an armed habitual criminal. As set forth in section 24-1.7(a) of the Criminal Code of 2012 (720 ILCS 5/24-1.7(a) (West 2014)), "A person commits the offense of being an armed habitual criminal if he or she *** possesses *** any firearm after having been convicted" of two or more qualifying offenses. Defendant does not dispute the State presented sufficient evidence to show he had two qualifying convictions; instead, defendant asserts the State failed to present sufficient evidence to show he possessed a firearm.

¶ 48　　　　At defendant's trial, it was undisputed a gun which matched the description provided by Chris was found hidden in the ceiling of the upstairs motel room where defendant and Maria had been staying. The jury heard testimony from Chris indicating he observed defendant approach him with the gun in his hand, point the gun at him, and then come down some stairs after the police were called. The jury also heard defendant's statements during the police interview indicating the gun was his, he had the gun in his pocket, Chris saw the gun in his pocket, his fingerprints could be found on the gun, and he put the gun in the motel room ceiling after the incident. Contrary to defendant's argument on appeal, we find neither Chris's testimony nor defendant's statements during the police interview were inherently incredible such that they should have been rejected by the jury. From the evidence presented, we find a rational trier of fact could have found, beyond a reasonable doubt, defendant possessed a firearm. The State presented sufficient evidence to sustain defendant's conviction for being an armed habitual criminal.

¶ 49　　　　　　　　　　　　　　III. CONCLUSION

¶ 50　　　　We affirm the trial court's judgment.

¶ 51          Affirmed.