NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180609-U

NO. 4-18-0609

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
November 25, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Vermilion County |
| CHRISTOPHER DAWSON, | ) | No. 17CF247 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Nancy S. Fahey, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE STEIGMANN delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held:*   The appellate court vacated defendant's conviction for aggravated domestic battery pursuant to the one-act, one-crime doctrine and affirmed defendant's remaining convictions and sentence.

¶ 2   In July 2017, the State charged defendant, Christopher Dawson, with one count each of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2016)), aggravated discharge of a firearm (*id.* § 24-1.2(a)(1)), aggravated domestic battery (*id.* § 12-3.3(a)), and two counts of unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). The charges alleged generally that on April 5, 2017, defendant, a felon, knowingly discharged a firearm in the direction of Antoinette Tidwell, his on-and-off girlfriend, causing her injury.

¶ 3   Defendant retained private counsel, but in December 2017, defendant fired his counsel and elected to proceed *pro se*.

¶ 4   Later in December 2017, the trial court conducted defendant's bench trial at which

the court found defendant guilty of all counts. In March 2018, the court sentenced defendant to 30 years in prison for aggravated battery with a firearm, 14 years in prison for unlawful possession of a weapon by a felon, and 12 years in prison for aggravated domestic battery, all to run concurrently.

¶ 5     Defendant appeals, arguing that (1) his battery convictions should be vacated because the State failed to prove defendant had the requisite mental state to sustain those charges, (2) the trial court erred when it failed to allow defendant a continuance to review the videotape evidence before completing the trial, and (3) defendant's aggravated domestic battery conviction should be vacated under the one-act, one-crime doctrine. We agree only with defendant's last argument and order his conviction for aggravated domestic battery vacated. We disagree with his other arguments and otherwise affirm the trial court's judgment in all respects.

¶ 6                              I. BACKGROUND

¶ 7     In July 2017, the State charged defendant by amended information (amending charges originally filed in April 2017) with one count each of aggravated battery with a firearm (*id.* § 12-3.05(e)(1)), aggravated discharge of a firearm (*id.* § 24-1.2(a)(1)), aggravated domestic battery (*id.* § 12-3.3(a)), and two counts of unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). The charges alleged generally that on April 5, 2017, defendant, a felon, knowingly discharged a firearm in the direction of Antoinette Tidwell, his off-and-on girlfriend, causing her injury. (We note that the State dismissed two other counts prior to trial.)

¶ 8                   A. Pretrial Proceedings and Waiver of Counsel

¶ 9     In April 2017, defendant appeared in court with private counsel, and the trial court conducted defendant's preliminary hearing. Private counsel represented defendant over the course of the next several months at multiple hearings.

¶ 10     At a pretrial hearing on December 11, 2017, before the parties could state their

appearances, defendant interjected, "I would like to object to any continuance." Shortly thereafter, defendant said, "Also, I would like to go *pro*[ ]*se*. My lawyer is fired." Defense counsel said, "Your Honor, I am going to be moving to continue this one week, with the agreement of [the State]." Defendant interjected, "I object to any continuance, and I would like to go *pro*[ ]*se*." The trial court told defendant that his position would be noted in the record. Defendant replied, "My lawyer is fired, for the record."

¶ 11        Defendant filed two letters, file-stamped December 12 and 13, 2017, in which he said (1) he objected to any continuance, (2) his private counsel was fired, and (3) he wanted to proceed *pro se*. Defendant also explained that he wanted "to go to trial ASAP" and that he was "ready for tr[ia]l."

¶ 12        On December 18, 2017, the trial court conducted a hearing at which it inquired about defendant's desire to proceed *pro se*. Defendant explained that he wanted to proceed *pro se* because he had a disagreement with his counsel regarding strategy. The trial court admonished defendant pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). In particular, the court said, "You're not going to receive any extra time for preparation or greater library time. Do you understand that?" Defendant replied, "Yes, ma'am." The court also said, "And in the event that I accept your decision to represent yourself, you will not be given an opportunity to change your mind during trial, and the trial is going to start tomorrow morning at 9:00. Do you understand that?" Defendant replied, "Yes, ma'am."

¶ 13        The trial court found that defendant made a knowing and intelligent waiver of his right to counsel. The court asked whether defendant wanted a bench or jury trial. Defendant said he would like a bench trial. The following exchange then occurred:

"THE COURT: And you're ready to proceed tomorrow? You have

- 3 -

witnesses lined up?

THE DEFENDANT: Yes, ma'am. All I ask, can I be able to go over a full review of my discovery?

THE COURT: Well, that will be turned over to you, and you'll have tonight to do that.

THE DEFENDANT: Will I be able to look over the films? Because I haven't seen nothing.

THE COURT: Well, that's because you've just decided at the last minute to go *pro*[ ]*se*.

THE DEFENDANT: Technically, we supposed to—we was scheduled to go to trial on the 4th, and I [*sic*] been having inconsistencies with my lawyer on—

* * *

THE COURT: Be that as it may, sir, the discovery will be turned over to you today, and you'll have tonight to look at it. If you don't think that's sufficient time, you can move to continue, but I've already granted your motion to go *pro*[ ]*se*, which is what you said you wanted to do.

THE DEFENDANT: Okay, ma'am. That's—that's all right.

THE COURT: You're ready to proceed for tomorrow?

THE DEFENDANT: Yes, ma'am."

¶ 14    Defendant then asked a question regarding issuing a subpoena for phone records, to which the trial court responded, "You're your own counsel. I can't give you legal advice. You would have to prepare your own subpoena." The court then asked defendant again, "Do you still wish to proceed tomorrow?" Defendant replied, "Yes." The court then noted that the State's

motions *in limine* were pending and told the parties that those would be addressed prior to trial the following day.

¶ 15        The following day, prior to the start of trial, the State informed the trial court that it was unsure whether defendant had been admonished, pursuant to Rule 401(a)(3), as to his right to a public defender if he is indigent. The court asked defendant if he was at all interested in having a public defender appointed to him, and defendant responded, "No. I want to still remain *pro*[ ]*se*."

¶ 16                              B. Defendant's Bench Trial

¶ 17                                1. *The State's Case*

¶ 18        In December 2017, the trial court conducted defendant's bench trial. Antoinette Tidwell testified that defendant was her boyfriend "[o]n and off for the last 15 years." Tidwell initially refused to testify until the trial court ordered her to answer the State's questions.

¶ 19        Tidwell testified that on April 5, 2017, she returned home after working earlier in the evening. When she got home, her son and defendant were there. Tidwell said that when she got home, things were "[p]erfect" between her and defendant but then things changed. Tidwell denied they had any argument or disagreement. The State asked her how she ended up getting shot in the face, and she did not know how she ended up getting shot in the face.

¶ 20        Tidwell did acknowledge that earlier on April 5, 2017, defendant came to her workplace, Buffalo Wild Wings, asked for food, and complained that Tidwell had an attitude. She also acknowledged that she stood "up in his face" and said, "Why I got attitude?" Tidwell stated that defendant complained that she did not check on him or give him attention and that at one point he "followed [her] through the restaurant and asked [her] for change."

¶ 21        Tidwell said that she and defendant were discussing this incident at her home later that night and acknowledged that the discussion turned into a "disagreement." Tidwell said that at

one point defendant pulled out a gun. They were "wrestling" and she felt defendant touch the gun to her face on her cheek two times. Defendant "was crying, talking to [Tidwell] saying he was tired of [her] and [her] bullshit." The State asked, "Did he threaten to use the gun in any way?" Tidwell responded, "Yeah. He had it on—he had it, like, on my face, saying that—that he was tired of me and this and that." Tidwell said, "He shot it. He shot it in the wall and it hit me." She elaborated that he shot the gun "[o]ne time" and the shot hit her "[i]n [her] face."

¶ 22    Tidwell testified that defendant owned a red Ford Explorer truck and a gray Cadillac. Tidwell said that defendant tried to take her to the hospital in his Explorer but she did not go with him. She went to her own car and went to defendant's house. While driving there, she called the police. When she arrived, defendant was not there. Tidwell testified that an ambulance arrived and took her to the hospital where she received medical treatment. She said they cleaned the wound, used "stitches, [and] staple[d] it together."

¶ 23    On cross-examination, Tidwell testified that she smoked cannabis after she left work and that it was possible that smoking cannabis could have impaired her memory of what happened. Tidwell said that it was "definitely possible" that the firearm went off by mistake while they were "tussling." After the firearm went off, Tidwell said, "you was holding me, saying that you was fittin' to take me to the hospital" but explained that they did not end up going.

¶ 24    Defendant attempted to ask a question about what appeared in a video, but the State objected, and the trial court sustained that objection. Defendant then asked, "[C]ould we review the 911 dispatch video?" The court told him that what Tidwell "told 911 is hearsay and not allowable in court." Defendant replied, "I understand. So I'm not able to review my discovery?" The court told defendant that it was not yet his case-in-chief and "you don't get to start introducing evidence in the middle of the State's case. You'll have an opportunity when the State is finished

to introduce your evidence."

¶ 25        On redirect examination, Tidwell explained that she did not know what caused the gun to fire but that the gun went off when defendant was on top of her and she was attempting to get him off of her and get the gun away from her face.

¶ 26        The State called several officers who described their examination of the crime scene and their investigation thereafter. Danielle Lewallen testified that she was a detective with the Danville Police Department and on April 5, 2017, at approximately 3:30 a.m., she met with Tidwell at Carle Hospital in Urbana. Lewallen said that initially Tidwell was not forthcoming about what had happened to her. At approximately 11:30 a.m., Tidwell came to the Public Safety Building in Danville to do an interview with Lewallen. The State offered into evidence a DVD containing a recording of that interview and stated, "I would move to admit it for impeachment purposes, but also to argue the impeachment is substantive evidence." The trial court asked if defendant had any objection, and defendant said, "No."

¶ 27        Lewallen then testified that during the interview, Tidwell explained what happened as follows: On April 5, 2017, defendant had come to her work drunk and asked for food. After Tidwell took defendant's order, defendant asked why she had an attitude. Tidwell said to defendant, "Because I'm a waitress, so I'm just standing up in his face like, what, why I got attitude?" Defendant said, "Get the fuck out of my face." Defendant then called Tidwell "bitches and hoes" and complained about her not giving him enough attention. This incident was the subject of their argument later that day at Tidwell's home. Defendant put a gun in her face approximately 10 times. Defendant said to Tidwell, "You don't think I'm going to do it. I'm going to take this bitch off safety right here."

¶ 28        Lewallen testified that on April 6, 2017, at approximately 10:45 p.m., she

interviewed defendant at the Champaign Police Department. Lewallen testified that defendant initially said "he was set up because he had jewelry and money." Defendant stated he was at Tidwell's home and a person named "Mac, he didn't identify any further, was the one responsible for that gun being drawn and the gun going off." Lewallen asked defendant for more information about Mac, but he was not able to provide any. Defendant eventually changed his story and told Lewallen that the gun went off when he attempted to "retreat" from his altercation with Tidwell.

¶ 29                            2. *Defendant's Motion to Continue*

¶ 30          Following the State's case-in-chief, defendant told the trial court that he wished to testify. Defendant also said, "I'm looking to subpoena—subpoena some phone records." The court responded, "Well, we're in the middle of trial, so I mean you do whatever you have to do, but we're starting up again tomorrow morning at 9:00." Defendant then asked whether he could have the video of his interrogation. The court replied that the video was in evidence so it had to stay with the clerk. Defendant replied as follows:

> "Yes. I also have copies of every video that I will be reviewing. The problem is that the staff members in the [public safety] building don't allow me to review these disks until the morning shift, and due to the fact that I got back yesterday at 5:00, I wasn't able to review them then, and I was told that I would have to review them on the morning shift, which is 9:00 and 3:00."

¶ 31          The State argued to the court, as follows:

> "Your Honor, when we were in court yesterday, the Defendant elected to go *pro*[ ]*se*. The [c]ourt gave him the opportunity to request a continuance to prepare his defense, and he specifically brought up the issue of reviewing DVDs. He was offered that opportunity by the [c]ourt, and he specifically declined and

- 8 -

said he did not want a continuance."

¶ 32    The court replied, "You did make those representations to the [c]ourt yesterday after repeated questioning, sir, and so the trial is going to start tomorrow morning at 9:00 a.m."

¶ 33                            3. *Defendant's Case*

¶ 34    The following morning, defendant testified in his own defense. He began by saying that he had been in a relationship with Tidwell for 15 years and he loved her. Defendant said that he got out of jail in 2014 and for a time was in a relationship with Tidwell but that they ultimately separated due to differences in their lifestyles. The day of the incident, defendant was with Tidwell's son, and he barbecued for her son, her son's friends, and their parents, approximately 25 people in total. Defendant said that when Tidwell returned from work, there was a "misunderstanding" about defendant's feeding the children's mothers. Tidwell did not get along with the other mothers. One of defendant and Tidwell's mutual friends was (1) at the house that day and (2) had a firearm that he left at the residence.

¶ 35    Defendant testified that Tidwell grabbed the firearm and defendant tried to stop her because neither of them were familiar with the firearm and he was worried it would go off. Defendant said that he tried to get the firearm away from Tidwell and put it in a safe position. He said that Tidwell said, "Shoot me. Go ahead, shoot me. Go ahead, shoot me." Defendant said that the firearm discharged "towards the wall area and fragments of the firearm pierced her face." Defendant claimed that the wound on Tidwell's face was not from the bullet itself, but that "[f]ragments of the ricochet somehow, some way ricocheted from the side of her face from us being so close."

¶ 36    Defendant testified further that he believed that Tidwell followed him rather than immediately getting medical attention because he believed "she had ulterior motive [*sic*] from the

beginning, as if it was premeditated that I would go back to jail." Defendant said, "[T]he honest truth is, this person inflicted this situation on herself."

¶ 37　　　　On cross-examination, defendant admitted he had been convicted of aggravated discharge of a firearm and aggravated unlawful use of a weapon. The State asked defendant about a statement he made to the police. Defendant said, "I had several statements. My whole—my whole—I didn't want to—this woman to get in trouble, being that she have a child and she's never been in the system before." Defendant said he eventually told the police the truth.

¶ 38　　　　Defendant explained the multiple stories he told the police. The State summarized them as follows, "So in one version, Mac pulls the firearm. In one version, you pull the firearm. And now in the third version, [Tidwell] pulls the firearm. Is that—do I have that accurate?" Defendant replied, "Yeah. *** I never admitted to saying that Mac pulled the firearm. I said that it was attempt [*sic*] that maybe, you know, I told them that it was attempt [*sic*] that somebody had maybe tried to hurt her or something like that." The State clarified that in that version, someone else pulled the firearm, and defendant replied, "Yes." The State also asked defendant about the stories he told regarding what happened to the firearm. The State again summarized the stories, asking, "So at least three different versions of what happened to the gun and where it was, correct?" Defendant answered, "Well, yes."

¶ 39　　　　The trial court found defendant guilty of all counts.

¶ 40　　　　　　　　　　　　C. Posttrial Motion and Sentencing

¶ 41　　　　In March 2018, the trial court conducted hearings on (1) defendant's posttrial motion and (2) defendant's sentencing. The court told defendant that she had read the motion and asked if defendant had anything to add to it. Defendant argued, in pertinent part, as follows:

　　　　　　　"I was only allowed—they was only allowed to present a small—a small

amount, like maybe less than 10 seconds, less than five to ten seconds of this investigation CD, which here it is, the CD was over an hour long, and \*\*\* if I can present this CD to the courtroom, it clearly have no indication of me committing or stating that I committed this crime."

¶ 42 The trial court replied, "Well, now wait a minute. I asked you if you wanted a continuance regarding the CD and you didn't, so go ahead."

¶ 43 Defendant responded as follows:

"I was told that I would be ready to proceed in my trial due to the fact that I was up under the assumption that I would be able to have access to review my investigation CDs and my discovery. As I went back to my location to where I was incarcerated at, I wasn't able to review my discovery at all, due to the fact that I am able to review the discovery during the morning hours and during the time that Officer Austinburg is present. So if Officer Austinburg is not present, I won't be able to review my CDs. \*\*\*

I came to court December 19th for the trial. As a proceeding of the trial, I informed you that I wasn't—that I wasn't able to review my CDs, which through my \*\*\* counsel on the ineffective assistance of counsel, \*\*\* my counsel never reviewed the CDs for me. So I would like to have a re-trial just off the strength of ineffective assistance of counsel, because my counsel never reviewed the CDs."

¶ 44 The trial court denied defendant's motion for a new trial. The court sentenced defendant to 30 years in prison for aggravated battery with a firearm, 14 years for unlawful possession of a weapon by a felon, and 12 years for aggravated domestic battery, all to run concurrently.

- 11 -

¶ 45          This appeal followed.

¶ 46                                    II. ANALYSIS

¶ 47          Defendant appeals, arguing that (1) his battery convictions should be vacated because the State failed to prove defendant had the requisite mental state to sustain those charges, (2) the trial court erred when it failed to allow defendant a continuance to review the videotape evidence before completing the trial, and (3) defendant's aggravated domestic battery conviction should be vacated under the one-act, one-crime doctrine. We agree only with defendant's last argument and order his conviction for aggravated domestic battery vacated. We disagree with his other arguments and otherwise affirm the trial court's judgment in all respects.

¶ 48                          A. The Evidence Was Sufficient

¶ 49                                    1. *The Law*

¶ 50          The State bears the burden of proving each element of an offense beyond a reasonable doubt. *People v. Gray*, 2017 IL 120958, ¶ 35, 91 N.E.3d 876. "When a defendant challenges the sufficiency of the evidence, a reviewing court must determine whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original and internal quotation marks omitted.) *People v. Harris*, 2018 IL 121932, ¶ 26, 120 N.E.3d 900.

¶ 51          "The trier of fact remains responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts." *Id.* "Accordingly, a reviewing court will not substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses." *People v. McGath*, 2017 IL App (4th) 150608, ¶ 26, 83 N.E.3d 671. A reviewing court will not reverse a defendant's conviction "simply because there is contradictory evidence or because the defendant claims a witness was not

- 12 -

credible." *People v. Mendez*, 2013 IL App (4th) 110107, ¶ 17, 985 N.E.2d 1047. Instead, "[a] conviction will not be reversed on appeal for insufficient evidence unless the evidence is so improbable or unsatisfactory that a reasonable doubt remains as to the defendant's guilt." *Harris*, 2018 IL 121932, ¶ 26.

¶ 52                                    2. *This Case*

¶ 53          Defendant argues that the State failed to produce sufficient evidence that the shooting in this case was knowing or intentional. In support of this argument, defendant claims that the occurrence witnesses, defendant and Tidwell, both testified that the gun discharged accidentally. Defendant also claims that their statements to the contrary were admissible only for impeachment and were not admitted substantively. We disagree.

¶ 54          Section 115-10.1 of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) states that evidence of a statement made by a witness is not made inadmissible by the hearsay rule if, as here, it is inconsistent with the testimony at trial, the statement is subject to cross-examination, the statement is about an event of which the witness had personal knowledge, and the statement is accurately recorded on video. 725 ILCS 5/115-10.1 (West 2016). Further, all evidence which is not expressly limited is admitted substantively. See *People v. Edwards*, 144 Ill. 2d 108, 168-69, 579 N.E.2d 336, 361 (1991) ("If the opponent of the evidence fails to ask for an instruction confining the evidence to its legitimate sphere, he is deemed to have waived any objection he may have.").

¶ 55          In this case, Detective Lewallen testified that Tidwell told her defendant said, "You don't think I'm going to do it" and "I'm going to take this bitch off safety right here." The State introduced into evidence a DVD containing a recording of that interview and stated, "I would move to admit it for impeachment purposes, but also to argue the impeachment is substantive

- 13 -

evidence." The trial court asked if defendant had any objection, and defendant said, "No." Accordingly, these statements were properly admitted as substantive evidence under section 115-10.1 of the Code of Criminal Procedure.

¶ 56        We further note that even without those statements described previously, Tidwell did admit that defendant threatened her just before he shot her. The State asked on direct examination, "Did he threaten to use the gun in any way?" Tidwell replied, "Yeah. He had it on—he had it, like, on my face, saying that—that he was tired of me and this and that." Tidwell continued by saying, "He shot it. He shot it in the wall and it hit me."

¶ 57        Based upon this evidence, after viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of the crimes proved beyond a reasonable doubt. See *Harris*, 2018 IL 121932, ¶ 26.

¶ 58        B. The Trial Court Did Not Err by Denying Defendant's Motion to Continue

¶ 59                                    1. *The Law*

¶ 60        " 'A trial court's decision to grant or deny a motion to continue is a discretionary matter, and this court will not set aside the trial court's determination unless it amounts to an abuse of discretion.' " *People v. Long*, 2018 IL App (4th) 150919, ¶ 112, 115 N.E.3d 295 (quoting *People v. Hillsman*, 329 Ill. App. 3d 1110, 1118, 769 N.E.2d 1100, 1107 (2002). A trial court's denial of a motion to continue will not be reversed unless it "in some manner embarrassed the accused in the preparation of his defense and thereby prejudiced his rights ***." *People v. Lewis*, 165 Ill. 2d 305, 327, 651 N.E.2d 72, 82 (1995).

¶ 61        "Whether there has been an abuse of discretion necessarily depends upon the facts and circumstances in each case [citations], and '[t]here is no mechanical test *** for determining the point at which the denial of a continuance in order to accelerate the judicial proceedings

violates the substantive right of the accused to properly defend.' " *People v. Walker*, 232 Ill. 2d 113, 125, 902 N.E.2d 691, 697 (2009) (quoting *People v. Lott*, 66 Ill. 2d 290, 297, 362 N.E.2d 312, 315 (1977)). "Factors a court may consider in determining whether to grant a continuance request by a defendant in a criminal case include the movant's diligence, the defendant's right to a speedy, fair and impartial trial[,] and the interests of justice." *Id.*

¶ 62                                    2. *This Case*

¶ 63        Defendant recognizes on appeal that "his desire to avoid further continuances is what motivated him to fire his privately retained attorney in the first place." Defendant also recognizes that the trial court told defendant that he could move to continue if he thought he needed more time to review discovery. Strangely, defendant claims that he "followed the court's prior instructions and asked for a short period of time to review the videos in the morning before the second day of trial and after the State rested." (We also note that defendant never explicitly moved to continue, nor did he "ask for a short period of time to review the videos" but instead merely described his problem reviewing the recording of his interview and that he "was told that [he] would have to review them on the morning shift, which is 9:00 and 3:00," which the State and trial court interpreted as a motion to continue.) Defendant argues that the trial court abused its discretion by not granting this continuance. We disagree.

¶ 64        We previously discussed at length the numerous steps that the trial court took to ensure that defendant was fully aware of his rights and was informed about his choices, and we need not reiterate those steps here. We simply note that (1) defendant fired his attorney just before trial because his attorney moved to continue and defendant objected, (2) defendant was informed on the day he fired his attorney that if he needed more time to review discovery he could move to continue and he did not make any such motion, and (3) the trial court, prior to the start of trial,

- 15 -

asked defendant multiple times if he was ready to proceed to trial, and defendant repeatedly responded that he was. We conclude that the trial court did not abuse its discretion by denying defendant's motion to continue.

¶ 65          C. Defendant's Aggravated Domestic Battery Conviction Should Be Vacated

¶ 66          Last, defendant argues that his convictions for aggravated battery and aggravated domestic battery of a single victim, namely Tidwell, violates the one-act, one-crime doctrine. The State concedes that defendant is correct, and we accept the State's concession.

¶ 67          "Multiple convictions are improper if they are based on precisely the same physical act." *People v. Smith*, 2019 IL 123901, ¶ 15, 155 N.E.3d 396. In this case, defendant's aggravated battery and aggravated domestic battery convictions both resulted from the same act—namely, defendant's shooting Tidwell once with the firearm.

¶ 68                              III. CONCLUSION

¶ 69          For the foregoing reasons, we vacate defendant's conviction and sentence for aggravated domestic battery (count IV) and otherwise affirm the trial court's judgment in all respects.

¶ 70          Affirmed in part and vacated in part.