2022 IL App (1st) 191929-U

FIFTH DIVISION
March 18, 2022

No. 1-19-1929

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 93 CR 5960 |
| | ) | |
| DAVID RODRIGUEZ a/k/a | ) | Honorable Michael B. McHale, |
| LUIS DAVID PENA, | ) | Judge Presiding. |
| | ) | |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Cunningham concurred in the judgment.

**ORDER**

*Held:* Rodriguez stated the gist of a constitutional claim in his postconviction petition when he argued that his natural life sentence was unconstitutional as applied to him; reversed and remanded.

¶ 1   In 1993, defendant, David Rodriguez, also known as Luis David Pena, pled guilty to the first degree murders of Juan Melendez and Rafael Garcia. The trial court found Rodriguez eligible for the death penalty, but after a hearing in aggravation and mitigation, the trial court sentenced him to natural life in prison. In 2019, Rodriguez filed a *pro se* postconviction petition arguing that his life sentence was unconstitutional as applied to him under the proportionate

penalties clause of the Illinois Constitution. The court summarily dismissed the petition. On appeal, Rodriguez claims that his petition should be remanded for second-stage postconviction proceedings where he stated the gist of a constitutional claim that the natural life sentence he received for offenses he committed when he was 18 years old was in violation of the proportionate penalties clause as applied to him. For the following reasons, we reverse and remand for second-stage postconviction proceedings.

¶ 2                                    I. BACKGROUND

¶ 3      Rodriguez was charged with two counts of first degree murder in connection with the shooting deaths of Rafael Garcia and Juan Melendez. The court informed him that if he was found guilty of murdering the victims, the only two sentences available would be either life imprisonment without parole or the death penalty. On November 23, 1993, Rodriguez pled guilty to two counts of first degree murder. The parties stipulated to the following facts in support of petitioner's guilty plea.

¶ 4      On November 2, 1992, at approximately 6:15 p.m., Melendez and Garcia arrived at 3049 West Belden Avenue in Chicago. The victims were members of the Latin Lovers gang, and Rodriguez was a member of the Orchestra Albany Boys.

¶ 5      When the victims arrived at that location, an argument ensued. Rodriguez took out a .357 Magnum revolver and fired numerous times at the victims, both of whom were unarmed. The victims were killed.

¶ 6      If called to testify, Jose Alvarado would testify that on the date in question he was 15 years old and lived with his family at 3022 West Belden in Chicago. He was sitting on the front porch of his house on the night in question, when at about 6:30 p.m., he saw a white Cadillac

pull up and park on Belden. He recognized the car as belonging to Garcia, who was also known as "Ace."

¶ 7 Garcia got out of the car with Melendez, who was also known as "Pee Wee." After Garcia parked, another car that Alvarado had never seen before pulled up and parked. Three or four guys got out and started talking to the Melendez and Garcia. They were talking about a fight that had happened earlier that day. They were accusing Melendez and Garcia of hitting someone with a pipe.

¶ 8 One of the individuals then challenged Melendez to a fight. An individual that Alvarado knew as "Too Short," who had been on the street before the other car pulled up, pulled out a gun. Alvarado would identify Rodriguez as "Too Short." Rodriguez started firing the gun at Garcia and Melendez. The victims tried to duck behind a car, but Rodriguez kept firing. Alvarado heard four shots.

¶ 9 Daniel Napier would testify that on November 2, 1992, he was visiting with his friend on Belden between Sacramento and Albany, when a Cadillac pulled up and parked. Two guys got out of the car whom he recognized as Pee Wee and Ace. After they got out of the car, they got into an argument with guys from the Orchestra Albany Street gang.

¶ 10 The argument was about a fight that had happened between the two gangs. During the argument Napier saw a guy he knew as Too Short walking up with a gun in his right hand. Rodriguez fired three or four shots at Garcia and Melendez, and everyone started running.

¶ 11 Robert Munoz would testify that on the date in question he was at Belden and Albany at 6:15 p.m. He saw an argument that was taking place next to a white Cadillac. He knew Ace from the neighborhood, but they were involved in different gangs. Munoz was in the Orchestra Albany

3

gang and Ace was a Latin Lover. Munoz also saw Too Short, who was recruited into the Orchestra Albany Boys gang about a year before. Munoz would identify Rodriguez as Too Short.

¶ 12    Munoz would testify that he saw Rodriguez pull out a gun and start shooting at Ace and Ace's friend. Rodriguez fired four shots and ran towards Sacramento. Munoz did not see anyone else with a gun.

¶ 13    It would be stipulated that Rodriguez "fled to Puerto Rico on November 3, 1992; that a warrant was lodged for his arrest; and that he was subsequently extradited back to Chicago."

¶ 14    Assistant State's Attorney Michael Holzman would testify that on February 27, 1993, he had a conversation with Rodriguez where Rodriguez admitted, "in summary, to shooting Juan Melendez and Rafael Garcia; and also admitted to fleeing to Puerto Rico; and as to what he had done with the gun after he shot the victims." ASA Holzman would testify that Rodriguez gave a court-reported statement, which the State requested to be offered into evidence and published to the court.

¶ 15    Rodriguez indicated in his statement that he was 18 years old, and a member of the Orchestra Albany Boys. He was also known as "Too Short." The Latin Lovers was a rival gang. He admitted standing on Belden Street on November 2, 1992, armed with a chrome .357 Magnum handgun. Two members of Latin Lovers pulled up, exited the car, flashed gang signs, and argued with another member of the Orchestra Albany Boys. Rodriguez pulled the gun from his pocket and shot Ace twice in the chest. He shot Pee Wee in the leg and back. Afterwards, he went to a nearby apartment, removed the shells from the gun and cleaned the gun. He threw the shells down and sold his gun to an unknown man. The next day, he flew to his mother's house in Puerto Rico. He was extradited back to Chicago five days later.

¶ 16    The court found that the factual basis supported Rodriguez's guilty plea and found him guilty of two counts of first degree murder. It found him eligible for the death penalty.

¶ 17    At Rodriguez's sentencing hearing, evidence was presented in both aggravation and mitigation. In aggravation, the State presented the testimony of Angela Adorno, a property manager for Res Corp Realty. She testified that on September 13, 1991, she and her assistant manager drove to a building she managed at 2744 North Spaulding Avenue where Rodriguez and five other members of the Orchestra Albany Boys were standing outside and would not leave. She saw Rodriguez participating in gang activity and "a lot of drug" activities from January 1991 to October 1991.

¶ 18    Nancy Glover testified that she lived at 2637 North Sawyer Avenue and in 1992 she noticed that Rodriguez and his fellow gang members routinely congregated in the alley beside her house. She saw Rodriguez approach cars and exchange small packages for cash, and she saw him block a neighbor's staircase as she attempted to enter her home with her children.

¶ 19    Chicago Police Officer James Arceo testified that on August 16, 1991, he and his partner were at 2620 North Spaulding Avenue when he observed three people approach Rodriguez, engage in a short conversation, and then exchange a "small package" for cash. Officer Arceo arrested Rodriguez and recovered $78 and multiple packages of suspected cannabis from his pockets. On September 13, 1991, Adorno approached him in the police station parking lot to tell him that Rodriguez and others were causing a disturbance at the property she managed and possibly selling narcotics.

¶ 20    Chicago Police Officer Frank Johnson testified that on August 4, 1992, four people in a car told him that "two Puerto Ricans" on bicycles had just robbed them at gunpoint. Both

suspects were eventually found and detained, and one of the victims identified Rodriguez as one of the armed robbers.

¶ 21    In mitigation, Christina Lickmann testified that Rodriguez was a member of the Orchestra Albany Boys, and she met him while working as a gang intervention counselor for Armitage Baptist Church. Lickmann had persuaded Rodriguez to leave his gang before the date in question, but he returned to the gang a few months later. While in custody for this case, Rodriguez told Lickmann that he had given his life to God and that he had changed his attitude towards his gang. The Orchestra Albany Boys had abandoned him since his arrest because he had attempted to convince them to stop selling drugs, to leave the gang, and to give their lives to God. Lickmann believed that Rodriguez had changed his life.

¶ 22    Pastor Charles Lyons of the Armitage Baptist Church testified that his church sponsored a gang intervention program. Pastor Lyons testified that while Rodriguez was incarcerated, he assisted the gang intervention program by writing letters encouraging other gang members to stop gang activities.

¶ 23    Rodriguez stated that he was sorry for what happened and asked God and the court to have mercy on him. Defense counsel argued that Rodriguez was a young man who gravitated to gangs because he had no family near him, and that since the murders he had changed his life. Defense counsel urged the court to consider Rodriguez's age and lack of substantial criminal record in favor of imposing a natural life sentence rather than the death penalty.

¶ 24    The trial court then sentenced Rodriguez, stating:

> "Mr. Rodriguez, I have reviewed the transcript as to the stipulations that
> were entered at the time of your plea of guilty. This is a very serious situation.
> The lives of two young men have been taken for no good reason at all.

6

They have been killed and they have been taken away from their families, and my heart and my sympathy goes out to their families because what you did has deprived them of something that we'll never know what they could possibly have been.

If I had the wherewithal to bring them back to their families I surely would do so. Being asked now by the State to take a third life, that being yours. A person who killed the other two, the law states that unless there is a factor in mitigation sufficient to preclude the imposition of the death penalty, the death penalty should be imposed.

Here I found that you were eligible for the death penalty. There is no doubt in my mind that you killed the two individuals; and again, for no reason whatsoever, and then after killing them, you fled the jurisdiction, went to Puerto Rico. Did not come back here voluntarily. You had to be brought back and I think that is a factor to be taken into consideration.

***.

Ultimately, you pled guilty here, and saying that you have found God. I presided over many people who have been found guilty. I presided over cases of people that have been found guilty of some kind of crime or another including people in the same situation as yours, and this finding of God by people such as yourself seems to me to be a very common phenomenon, especially in cases such as yours when one is faced with the possibility of meeting his maker through the imposition of the death penalty.

I don't know if your situation is any different than the others, but oftentimes I find it to be put forth just so the death penalty won't be imposed and the finding of God is for a temporary period; and once the crisis is over, the finding of God is gone, and one such as yours go back to being as you were before.

&ast;&ast;&ast;

I have read the pre-sentence report in this case. I have heard the factors in aggravation and mitigation through the Defendant and stipulations here today, and I have looked at your criminal, prior criminal background, and it appears to contain nothing very serious. &ast;&ast;&ast;

I heard through live testimony about your drug transactions, selling of narcotics, &ast;&ast;&ast;. Nothing of a violent nature, and I [will] take that into consideration. I also do take into consideration the fact that you did plead guilty to the charge.

Having heard everything that is relevant, I find that there is a factor in mitigation sufficient to preclude the imposition of the death penalty in this case and because of that, I'm going to sentence you to a life sentence – a sentence of life imprisonment without parole."

¶ 25    On July 17, 2019, Rodriguez filed a *pro se* postconviction petition arguing that his life sentence was unconstitutional as applied to him under the proportionate penalties clause. He stated that his actual date of birth was October 1, 1974, making him just over 18 years old at the time of the shooting. He stated that he "tried to save his family name from shame and embarrassment" and used an alias and a false date of birth. His real name is Luis David Pena and

he was born in Caguas, Puerto Rico. Rodriguez attached his birth certificate to the petition. We note that in the record, the signed statement that Rodriguez gave to prosecutors contains the name "Luis David Rodriguez" and initially indicated his birth date as October 1, 1973. However, the "1973" was crossed out and changed to "1974", which was initialed by Rodriguez, the two state's attorneys, and a detective.

¶ 26    Rodriguez claimed in his postconviction petition that his natural life sentence, imposed for a crime he committed at the age of 18, was unconstitutional under the proportionate penalties clause as applied to him. Specifically, Rodriguez noted that his father was an alcoholic who beat him, his mother neglected him, and he ended up living on the streets at a young age. He was peer pressured into doing drugs and getting involved in gangs. He tried to escape but could not. His father did not provide affection or encouragement, but instead offered him alcohol at a young age. Because of his small stature, Rodriguez was bullied often, and had to learn to defend himself. Rodriguez grew up alone in a very unstable environment, "living on the streets[,] sleeping in other people's homes[,] cars[,] or parks around the neighborhoods." He ended up in a gang "where violence, drugs, and alcohol [were] a means to escape the hurt and pain imposed at home."

¶ 27    Rodriguez cited to *Miller v. Alabama*, 567 U.S. 460 (2012), for the proposition that certain considerations should have been a factor in his sentencing because his brain had not yet fully developed at the time of the offense, and he suffered from the "same immatur[ity], impulsive[ness], [and] recklessness" as juveniles "that make them less culpable in their crimes." Rodriguez asserted that he received a life sentence without being given the opportunity to demonstrate that his conduct was not the result of him being "irretrievably corrupt" but rather because he was impulsive, reckless, immature, and his brain was still developing.

¶ 28    Rodriguez included in his petition a separate document entitled, "Memorandum of New Illinois Supreme Court Law Decision," which cited *People v. Harris*, 2018 IL 121932, *People v. House*, 2019 IL App (1st) 110580-B, and *People v. Buffer*, 2019 IL 122327.

¶ 29    He also attached several scientific studies that explained the developing science related to emerging adults. Rodriguez included scientific research that explained the hallmarks of adolescence that continue into young adulthood – impulsiveness, recklessness, and immaturity – are only further exacerbated in young adults who are exposed to abuse or other chronically traumatic experiences as a child.

¶ 30    On August 1, 2019, the trial court summarily dismissed the petition. The written order, in its entirety, stated:

> "Petitioner acknowledges that he was 18 years of age at the time of the offense. For purposes of 8th Amendment issues, an individual's 18th birthday marks the bright line between juveniles and adults. Petitioner has been sentenced as an adult. See *People v. Harris*, 2018 IL 121932. Similarly, *People v. Buffer*, 2019 IL 122327 does not support petitioner's claim. The issues raised and presented by the petitioner are frivolous and patently without merit. His petition filed July 17, 2019, is dismissed."

¶ 31    The trial court did not address Rodriguez's only claim in his postconviction petition – that his sentence was unconstitutional as applied to him under the proportionate penalties clause of the Illinois Constitution. Rodriguez now appeals.

¶ 32                                    II. ANALYSIS

¶ 33    On appeal, Rodriguez contends that his *pro se* postconviction petition stated the gist of constitutional claim when he alleged that his life sentence for a crime he committed when he was

18 years old was unconstitutional as applied to him under the proportionate penalties clause of the Illinois Constitution. Ill. Const. 1970, art. I, § 11. The State responds that the trial court's order dismissing the petition as frivolous and patently without merit should be affirmed because, "given the petitioner's malicious and cold-blooded instigation and commission of the double murder, there was no arguable basis to conclude, not withstanding petitioner's status as a young adult, that the resulting life sentence was so shocking to the moral sense of the community that it does not withstand under the proportionate penalties clause." We agree with Rodriguez and remand his postconviction petition for second-stage proceedings.

¶ 34    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq*. (West 2018)) provides a framework for an incarcerated individual to collaterally attack his conviction by establishing the substantial denial of a constitutional right at trial or at sentencing that resulted in that conviction. 725 ILCS 5/122-1(a)(1) (West 2018). Claims are limited to those that were not, and could not have been, previously litigated. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). Proceedings under the Act occur in three stages. At the first stage, the circuit court determines, without input from the State, whether a petition is frivolous or patently without merit. *People v. Gaultney*, 174 Ill. 410, 418 (1996); 725 ILCS 5/122-2.1(a)(2) (West 2018). At the second stage, the court appoints counsel to represent the defendant and, if necessary, to file an amended petition. *Id*. At this stage, the State must either move to dismiss or answer the petition. *Id*.; 725 ILCS 5/122-4, 5 (West 2018). If the petition and the accompanying documentation make a substantial showing of a constitutional violation, the defendant may then proceed to the third stage, where the trial court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2018).

¶ 35    Rodriguez's petition was dismissed at the first stage. Our supreme court has stated that to survive first-stage scrutiny, a petition need only state the "gist" of a constitutional claim. *People*

*v. Hodges*, 234 Ill. 2d 1, 9 (2009). Formal legal argument and citation to authority are not required (*id.*), and all well-pleaded facts that are not positively rebutted by the record must be taken as true (*People v. Romero*, 2015 IL App (1st) 140205, ¶ 26). A petition may be summarily dismissed as "frivolous or patently without merit" only when it has "no arguable basis either in law or in fact." *People v. Boykins*, 2017 IL 121365, ¶ 9. We review the summary dismissal of a postconviction petition *de novo. People v. Brown*, 236 Ill. 2d 175, 184 (2010).

¶ 36    We begin with a brief overview of the current law on this issue. The eighth amendment of the United States Constitution, which is applicable to the states through the fourteenth amendment, prohibits government from imposing "cruel and unusual punishments" for criminal offenses. *Roper v. Simmons*, 543 U.S. 551, 560 (2005). The eighth amendment guarantees individuals the right not to be subjected to excessive sanctions. *Id*. The right flows from the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349, 367 (1910). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper*, 543 U.S. at 560. The Supreme Court explained:

> "The prohibition against 'cruel and unusual punishments,' like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework, we have established the propriety and affirmed the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Id.* at 560-61.

¶ 37 When the offender is a juvenile and the offense is serious, there is a genuine risk of disproportionate punishment. *People v. Holman*, 2017 IL 120655, ¶ 33. In *Roper*, *Graham*, and *Miller*, the United States Supreme Court addressed that risk and concluded that youth matters in sentencing. *Roper* held that the eighth amendment prohibited capital sentences for juveniles who commit murder. 543 U.S. at 578-79. *Graham* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit nonhomicide offenses. 560 U.S at 83. And *Miller* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit murder. 567 U.S. at 489-90. Our supreme court in *Holman*, 2017 IL 120655, ¶ 43, adopted the *Miller* factors.

¶ 38 However, these protections afforded by the eighth amendment apply directly only to juveniles. As our supreme court has noted, the United States Supreme Court "has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *People v. Harris*, 2018 IL 121932, ¶ 58. It stated that "claims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected." *Id.* ¶ 61.

¶ 39 The trial court in this case summarily dismissed Rodriguez's postconviction petition based on the foregoing legal precedent, stating, "Petitioner acknowledges that he was 18 years of age at the time of the offense. For purposes of 8th Amendment issues, an individual's 18th birthday marks the bright line between juveniles and adults. Petitioner has been sentenced as an adult." Rodriguez's argument, however, was not brought pursuant to the eighth amendment, but rather to the proportionate penalties clause of the Illinois Constitution.

¶ 40 The proportionate penalties clause of the Illinois Constitution specifically provides that "[a]ll penalties shall be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our

13

supreme court has explained that this emphasis on rehabilitative potential provides "a limitation on penalties beyond those afforded by the eighth amendment." *People v. Clemons*, 2012 IL 107821, ¶¶ 39-41. And it has acknowledged that young adult offenders are "not necessarily foreclosed" from raising as-applied challenges to life sentences based on the evolving science on juvenile maturity and brain development under the proportionate penalties clause." *Harris*, 2018 IL 121932, ¶¶ 46, 48. See *Thompson*, 2015 IL 118151, ¶¶ 43-44 (the as-applied, youth-based sentencing claim of an 18-year-old offender would be more appropriately raised in postconviction proceedings rather than on direct appeal); see also *Harris*, 2018 IL 121932, ¶ 48 "The court has thus opened the door to the possibility that a young-adult offender might demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was 'cruel, degrading, or so wholly disproportionate to the offense that it shocks the moral sense of the community.' " *People v. Zumot*, 2021 IL App (1st) 191743, ¶ 27 (quoting *People v. Klepper*, 234 Ill. 2d 337, 348 (2009)).

¶ 41     In *People v. House*, 2021 IL 125124, the 19-year-old petitioner raised an as-applied challenge to his life sentence under the proportionate penalties clause in a postconviction petition. Our supreme court found that because there was not an evidentiary hearing on that issue in the trial court, the petitioner therefore did not provide or cite to any evidence relating to how the evolving science on juvenile maturity and brain development applied to his specific facts and circumstances, and the trial court made no factual findings critical to determining whether the science concerning juvenile maturity and brain development applied to petitioner specifically. While the appellate court cited articles from a newspaper and an advocacy group in support of its decision to find the petitioner's sentence unconstitutional, our supreme court noted that "no trial

court has made factual findings concerning the scientific research cited in the articles, the limits

of that research, or the competing scientific research, let alone how that research applies to

petitioner's characteristics and circumstances." *Id*. ¶ 29. Because the court determined that the

record in that case required further development, it remanded the case for second-stage

postconviction proceedings. *Id*. ¶ 32.

¶ 42     Similarly in *Harris*, 2018 IL 121932, the 18-year-old defendant claimed that his life

sentence was unconstitutional as applied to him under the proportionate penalties clause. Our

supreme court noted that "[a]ll as-applied constitutional challenges are, by definition, dependent

on the specific facts and circumstances of the person raising the challenge," and that it is

therefore paramount that the record be sufficiently developed in terms of those facts and

circumstances for appellate review. *Id*. ¶ 39.  The court stated:

> "A court is not capable of making an 'as applied' determination of
>
> unconstitutionality when there has been no evidentiary hearing and no findings of
>
> fact. Without an evidentiary record, any finding that a statute is unconstitutional
>
> 'as applied' is premature." *Id*.

¶ 43     The *Harris* court noted that the record "includes only basic information about defendant,

primarily from the presentence investigation report. An evidentiary hearing was not held, and the

trial court did not make any findings on the critical facts needed to determine whether *Miller*

applies to defendant as an adult." *Id*. ¶ 46. The court stated that the "critical point" is "whether

the record has been developed sufficiently to address the defendant's constitutional claim." *Id*. ¶

41. As the court in *Harris* emphasized, "a reviewing court is not capable of making an as-applied

finding of unconstitutionality in the 'factual vacuum' created by the absence of an evidentiary

hearing and findings of fact by the trial court." *Id.* (quoting *People v. Minnis*, 2016 IL 119563, ¶ 19).

¶ 44    Here, we find that Rodriguez's postconviction stated the gist of a constitutional claim where he argued that his life sentence was unconstitutional under the proportionate penalties clause as applied to him. Rodriguez attached his birth certificate to the petition that indicated his real name to be Luis David Pena, and that he was born on October 1, 1974, making him just barely 18 years old when he committed this offense. Rodriguez pointed to his troubled upbringing, his abusive alcoholic father, having to live in the streets and sleeping in parks or other people's homes and cars. Rodriguez explained his susceptibility to peer pressure, his abuse of drugs, and how he came to join a gang.

¶ 45    Rodriguez's petition also referenced scientific studies that explained the developing science relating to emerging adults and conclude that the hallmarks of youth – impulsiveness, recklessness, and immaturity – are further exacerbated when children are exposed to abuse or other traumatic experiences. Accordingly, there was evidence presented that at least arguably indicates that at the time of the offense, Rodriguez was sufficiently similar to a juvenile such that the trial court should have considered his age and other factors before sentencing Rodriguez to a life sentence. See *Boykins*, 2017 IL 121365, ¶ 9 (a petition may be summarily dismissed as "frivolous or patently without merit" only when it has "no arguable basis either in law or in fact.")

¶ 46    The State maintains that the summary dismissal of Rodriguez's petition should be affirmed because "given petitioner's malicious and cold-blooded instigation and commission of the double murder, there was no arguable basis to conclude, notwithstanding petitioner's status as a young adult, that the resulting life sentence was so 'shocking' as to the 'moral sense of the

community' that it does not withstand under the proportionate penalties clause." The State relies on the fact that Rodriguez was an adult, that he was the triggerman, and that he secured passage to Puerto Rico to avoid capture, thereby nullifying his challenge under the proportionate penalties clause. The State claims that *People v. McClurkin*, 2020 IL App (1st) 171274, supports its argument.

¶ 47    In *McClurkin*, the defendant was 24 years old at the time of the offense. *Id.* ¶ 5. He was convicted of the first degree murders of two victims. *Id.* The jury found the defendant eligible for the death penalty, but the trial court sentenced him to natural life after concluding that mitigating evidence precluded the death penalty. *Id.* ¶ 8. In requesting leave to file a successive postconviction petition, the defendant claimed that his mandatory life sentence was unconstitutional as applied to him under the proportionate penalties clause because the trial court did not consider his history of abuse, his personality disorder, and his young age at the time of the offense. *Id.* ¶¶ 11, 14. The trial court denied the defendant leave to file a successive postconviction petition, and this court affirmed. This court noted that defendant had felony criminal convictions in 1991 and 1994, including armed violence, with prison terms of six and four years respectively. *Id.* ¶ 7. It stated that the "defendant was a 24-year-old adult – no longer a teenager as in *House* – when he committed the murders." *Id.* ¶ 21. It noted that the defendant also had a criminal history of committing violent crimes. *Id.* The defendant's diagnosis of personality disorder was before the trial court during sentencing, and "personality or behavioral disorders may be aggravating as well as mitigating factors in sentencing." *Id.* ¶ 22. This court found that the defendant did not show the requisite prejudice for filing a successive petition. *Id.* ¶ 23.

¶ 48     We find *McClurkin* to be unpersuasive here where Rodriguez's postconviction petition was not a successive petition, but rather his first postconviction petition, he had just turned 18 years old at the time of the offense, not 24 years old, he did not have a significant criminal history, and most importantly, he did not have the opportunity to present any of the evidence contained in his postconviction petition at his sentencing hearing. In *People v. Daniels*, 2020 IL App (1st) 171738, the defendant raised an as-applied proportionate penalties clause challenge to his life sentence in a post-conviction petition, and this court noted that, "[n]owhere did the *Harris* court suggest – and nowhere does *House* suggest, we might add – that a defendant's degree of participation in a crime or discretionary sentence should utterly disqualify him or her from raising such a claim." *Id.* ¶ 31. This court in *Daniels* further noted that because the defendant "directed this court's attention to at least some contemporaneous documentation regarding his mental health and personal characteristics that he might use to support" his constitutional claim, he was entitled to further proceedings. *Id*. ¶ 34.  We likewise find that Rodriguez is entitled to further proceedings.

¶ 49                              III. CONCLUSION

¶ 50     For the foregoing reasons, we find that Rodriguez stated the gist of a constitutional claim in his postconviction petition where he argued that the imposition of a natural life sentence was unconstitutional as applied to him. We remand for second stage proceedings.

¶ 51     Reversed and remanded.