2022 IL App (1st) 210077-U

FIFTH DIVISION
March 25, 2022

No. 1-21-0077

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of Cook County. |
| | ) | |
| v. | ) | 90 CR 21478 |
| | ) | |
| MARCUS WILLIAMS, | ) | Honorable Thomas Hennelly, |
| | ) | Judge Presiding. |
| Defendant-Appellant. | ) | |

JUSTICE CONNORS delivered the judgment of the court.
Presiding Justice Delort and Justice Hoffman concurred in the judgment.

**ORDER**

*Held:* Williams's motion for leave to file a successive postconviction petition was properly denied where he failed to satisfy the cause-and-prejudice test in arguing that his natural life sentence was unconstitutional as applied to him under the proportionate penalties clause of the Illinois Constitution; affirmed.

¶ 1 Following a jury trial, petitioner, Marcus Williams, was found guilty of two counts of first degree murder and sentenced to two concurrent natural life sentences in prison. Since his convictions, Williams appealed his case, filed a postconviction petition, and filed several motions for leave to file successive postconviction petitions, none of which have been

successful. This case comes before us on appeal from the trial court's denial of his latest motion for leave to file a successive postconviction petition. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Williams was charged with the first degree murders of Michelle Parker and Lloyd Washington, which occurred on August 17, 1990, when Williams was 19 years old. The evidence adduced at trial was discussed on direct appeal in *People v. Williams*, No. 91-3463 (Feb. 17, 1994) (unpublished order under Supreme Court Rule 23), and will only be reiterated here as necessary.

¶ 4      At trial, four witnesses testified that they were standing outside a house on South Calumet in Chicago when they saw Williams ride by on a bike at 8:45 p.m. on the date in question. He rode into the alley and seconds later they heard three gunshots. Then they saw Williams ride out of the alley. The four witnesses had never seen Williams before, but identified him in photographs, a lineup, and in open court.

¶ 5      When officers arrived at the alley at about 9 p.m., they saw a Chevrolet Beretta with the driver's side door open and the engine running. Lloyd Washington was in the driver's seat and Michelle Parker was in the passenger's seat. They both had been shot in the head. Lloyd died before the ambulance arrived. Michelle, who was unconscious, was taken to the hospital where she died seven days later.

¶ 6      Deborah Washington, Lloyd's sister, testified that Lloyd was dating Michelle in August 1990. Deborah owned the Chevrolet Beretta and had let Lloyd borrow it on August 13, 1990.

¶ 7      A latent print expert testified that a fingerprint taken from the driver's side door of the Chevrolet Beretta was identical to Williams's left ring fingerprint.

¶ 8    Dorothy Parker, Michelle's sister, testified that Michelle had dated Williams, but stopped dating him sometime before May 1990. In May 1990, Dorothy and Michelle lived in the same apartment. On May 4, 1990, at about 10 p.m., she heard Michelle screaming and crying in the other room. Dorothy saw Michelle lying on the floor and Williams standing over her, kicking her. He yelled, "Get up, you are coming with me," and pulled Michelle out of the home. Michelle ran away to her grandmother's house and Dorothy called the police to report a battery. No charges were filed against Williams.

¶ 9    Doramil Parker, Michelle's mother, testified that Michelle began dating Williams in 1986, but Williams did not visit Michelle in the hospital after she was shot. Williams called five or six times to ask about her condition. On August 22, 1990, she told Williams that Michelle had regained consciousness.

¶ 10    On August 22, 1990, Williams turned himself into the police.

¶ 11    Hazel Turner, Williams's grandmother, testified that Williams dated Michelle for six years and was still dating her in August 1990. On August 17, 1990, she saw Williams leaning against the driver's side of a red car parked in her driveway that looked like the Chevrolet Beretta owned by Deborah Washington. She last saw Williams at 8 p.m. that night. She testified that Williams did not own a bicycle.

¶ 12    The jury found Williams guilty of the first degree murders of Michelle and Lloyd.

¶ 13    At sentencing, the trial court noted that it had read Williams's presentencing investigation report (PSI). The PSI showed that Williams was an only child, raised by both parents, and had a "great" childhood. Williams did not have any health problems besides asthma. Williams graduated high school in 1988 and attend DeVry Institute of Technology for a semester. He

3

worked at McDonald's and then joined the family business repairing furniture from 1989 to 1990. He did not drink alcohol and had never used drugs.

¶ 14    In aggravation, the State noted that Williams had a 1987 conviction for unlawful use of a weapon in a schoolyard and two convictions in 1990 for possession of a controlled substance. The State asked the court to take into account that the victims were 23 and 25 years old when they were killed, and the effect their murders had on their respective families.

¶ 15    In mitigation, defense counsel presented testimony from Jessie Holland, Williams's aunt, who told the court that Williams went to church regularly and treated her with respect and love. She did not believe that he committed the crimes.

¶ 16    Molly Calloway, Williams's aunt, stated that she helped raise Williams and that when her husband had his leg amputated, Williams called daily and came over to help her with chores. She saw Williams at church and at family functions, and thought he was innocent of the crimes.

¶ 17    Maurice Calloway, Williams's great uncle, stated that Williams visited him regularly, helped out around the house, was respectful, and attended church and family functions. He did not believe Williams committed the murders.

¶ 18    Turner stated that she raised Williams, he helped her manage her investment property, he was respectful, and he was mature enough to babysit her seven-year-old adopted daughter.

¶ 19    Defense counsel argued that the unlawful use of a weapon charge "was not for firing a weapon," and he was sentenced on that case "two days before his 17th birthday. Hardly indicative of somebody – who you could tell at age forty or forty-five or thirty-five has no rehabilitative potential." Defense counsel noted that at 20 years old at the time of sentencing, Williams's life expectancy was more than double what he has already lived. Counsel asked the

court to disregard the mandatory sentencing parameters and impose a sentence based on the mitigation evidence.

¶ 20    The trial court then sentenced Williams to a term of natural life for the murder of Michelle, and a term of natural life for the murder of Lloyd, to run concurrently.

¶ 21    This court affirmed Williams's convictions on February 17, 1994. See *People v. Williams*, No. 91-3463 (Feb. 17, 1994) (unpublished order pursuant to Supreme Court Rule 23). Williams' petition for leave to appeal to the Illinois Supreme Court was denied. *People v. Williams*, 157 Ill. 2d 520 (1994).

¶ 22    On January 11, 1995, Williams filed a *pro se* postconviction petition that made several allegations, including that his life sentence was excessive, and the trial court abused its discretion for failing to consider mitigating factors during sentencing. The court summarily dismissed his petition as frivolous and patently without merit. Williams appealed.

¶ 23    The Cook County public defender's office filed a motion with this court asking to withdraw from the case under *Pennsylvania v. Finley*, 481 U.S. 551 (1987). We granted the motion and affirmed the dismissal of Williams's *pro se* postconviction petition. *People v. Williams*, No. 95-2753 (Jan. 25, 1996) (unpublished order under Supreme Court Rule 23).

¶ 24    On April 10, 1998, Williams filed a *pro se* "motion for appointment of investigator." The court denied the motion two weeks later. Williams appealed and the Cook County public defender's office again filed a motion to withdraw under *Finley*, 481 U.S. 551 (1987). We granted the public defender's motion to withdraw and affirmed the denial of Williams's motion to appoint an investigator. *People v. Williams*, No. 98-4853 (July 28, 1999) (unpublished order under Supreme Court Rule 23).

¶ 25     Between February 1999 and March 2003, Williams pursued a federal *habeas corpus* petition. After an evidentiary hearing on the allegation that his trial counsel was ineffective for failing to investigate an exculpatory witness, the district court denied relief. *United States ex rel. Williams-El v. Briley*, No. 99 C 0933, 2002 WL 31027966 (N.D. Ill. Sept. 6, 2002); *United States ex rel. Williams-El v. Briley*, No. 99 C 0933, 2003 WL 742192 (N.D. Ill. Mar. 4, 2003).

¶ 26     On March 15, 2010, Williams filed a motion for leave to file a successive postconviction petition, alleging that the summary dismissal of his initial 1995 postconviction petition was void because it occurred more than 90 days after he filed the petition. On July 30, 2010, the trial court appointed the Cook County public defender's office to represent Williams on his subsequent postconviction petition. However, in September 2011, Williams was given leave to proceed *pro se*. Between March 2010 and January 2012, multiple versions of another postconviction petition were filed. On January 13, 2012, Williams filed a final version of that petition, which alleged ineffective assistance of trial and appellate counsel, insufficiency of the evidence, trial court error, and prosecutorial misconduct. On August 10, 2012, the trial court granted the State's motion to dismiss the motion for leave to file a successive postconviction petition.

¶ 27     On appeal, this court initially reversed the trial court's order granting the State's motion to dismiss and remanded for further proceedings. See *People v. Williams*, 2014 IL App (1st) 123357-U. However, the Illinois Supreme Court then issued a supervisory order directing this court to vacate its judgment and reconsider it in light of *People v. Castleberry*, 2015 IL 116916. *People v. Williams*, No. 118316 (2016) (supervisory order). On February 14, 2017, this court affirmed the judgment of the circuit court granting the State's motion to dismiss Williams's motion for leave to file a successive postconviction petition.

¶ 28    In 2017, Williams filed a *pro se* motion for leave to file a second successive postconviction petition. He alleged that appellate counsel from his initial postconviction petition failed to provide a reasonable level of assistance, and that the trial court abused its discretion in denying his motion to allow expert testimony on the reliability of eyewitness identifications. The circuit court denied Williams's motion for leave to file a second successive postconviction petition. Williams appealed, and the Office of the State Appellate Defender was appointed to represent him.

¶ 29    In 2018, Williams filed a *pro se* motion for leave to file a third successive postconviction petition, which claimed that there was newly discovered evidence. After the court denied him leave to file the third successive postconviction petition, the Office of the State Appellate Defender was appointed to represent him. This court consolidated both appeals, and appointed counsel filed a motion for leave to withdraw pursuant to *Finley*. Williams was given an opportunity to respond to appointed counsel's contention that there was no merit to the appeal. In response, Williams argued that the sentencing statute violated the single subject rule and that his natural life sentence was unconstitutional. On February 28, 2020, we affirmed the denial of leave to file for both the consolidated cases and granted appointed counsel's *Finley* motion. *People v. Williams*, Nos. 1-17-1381 & 1-18-0830 (cons.) (Feb. 28, 2020) (unpublished order under Illinois Supreme Court Rule 23).

¶ 30    On September 12, 2019, Williams filed the instant *pro se* motion for leave to file a fourth successive postconviction petition. In his motion, Williams claimed that under *Miller v. Alabama*, 567 U.S. 460 (2012), and *People v. Davis*, 2014 IL 115595, his mandatory life sentence was unconstitutional as applied to him under the proportionate penalties clause of the Illinois Constitution. Ill. Const. 1970, art. I, § 11. He argued that he was 19 years old at the time,

and "while clearly no longer a juvenile at the age of 19, [he] was still a teenager and ultimately a young adult." Williams argued that *Miller* applied to him because "scientific research and national consensus indicated that a 19-year-old exhibit the same hallmark features of youth that justified the decision in *Miller.*" He stated that "research and articles discussed the differences between young adults, like Williams, and a fully mature adult." He contended that young adults are more similar to adolescents than adults because they are more susceptible to peer pressure, less future-oriented, and more volatile in emotionally charged settings. He stated that there have been recent trends in new legislation that consider age and maturity level of people under the age of 21. Williams argued that his "youthfulness and lack of a criminal history of committing violent crimes are indeed relevant."

¶ 31     The trial court denied Williams leave to file a fourth successive postconviction petition, and Williams now appeals.

¶ 32                                II. ANALYSIS

¶ 33     On appeal, Williams contends that the trial court erred in denying his leave to file a fourth successive postconviction petition because the mandatory life sentence imposed when he was 19 years old violated the proportionate penalties clause of the Illinois Constitution, as applied to him. The State maintains that the trial court properly denied Williams leave to file a fourth successive postconviction petition where he did not prove cause and prejudice.

¶ 34     The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)) provides a statutory mechanism for a criminal defendant to assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2020). The Act contemplates the filing of only a single petition. *People v. Robinson*, 2020 IL 123849, ¶ 42.

However, the bar against a successive filing will be relaxed in two situations. First, a defendant may raise a constitutional claim by satisfying the cause-and-prejudice test. *Id*. Second, a defendant may assert a claim of actual innocence. *Id*. Prior to filing a successive postconviction petition, a petitioner must obtain leave of the circuit court. *Id*. ¶ 43. Our review of the court's denial of a motion seeking leave to file is *de novo*. *Id*. ¶ 39.

¶ 35    Because Williams is raising a claim of a violation of the proportionate penalties clause of the Illinois Constitution, he must establish cause and prejudice. To establish cause, a petitioner must show some objective factor external to the defense that impeded his ability to raise the claim in his initial postconviction proceeding. *People v. Pitsonbarger*, 205 Ill. 2d 444, 460 (2002). Both parties agree that because *Miller* had not been decided at the time Williams filed his initial postconviction petition, this prong has been met.

¶ 36    To establish prejudice, the defendant must show the claimed constitutional error so infected his trial that the resulting conviction violated due process. *Id.* At 464. The cause-and-prejudice test for a successive postconviction petition applies a higher standard than the first-stage frivolous or patently without merit standard that is set forth in section 122-2.1(a)(2) of the Act. *People v. Edwards*, 2012 IL 111711, ¶¶ 26-27. To meet the cause-and-prejudice test for a successive petition requires the defendant to "submit enough in the way of documentation to allow a circuit court to make that determination." *People v. Tidwell*, 236 Ill. 2d 150, 161 (2010). "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentations submitted by the petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *People v. Smith*, 2014 IL 115946, ¶ 35.

¶ 37    The eighth amendment of the United States Constitution, which is applicable to the states through the fourteenth amendment, prohibits the government from imposing "cruel and unusual punishments" for criminal offenses. *Roper v. Simmons*, 543 U.S. 551, 560 (2005). The eighth amendment guarantees people the right not to be subjected to excessive sanctions. *Id*. The right flows from the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349, 367 (1910). "By protecting even those convicted of heinous crimes, the Eighth Amendment reaffirms the duty of the government to respect the dignity of all persons." *Roper*, 543 U.S. at 560. The Supreme Court explained:

> "The prohibition against 'cruel and unusual punishments,' like other expansive language in the Constitution, must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework, we have established the propriety and affirmed the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Id*. at 560-61.

¶ 38    When the offender is a juvenile and the offense is serious, there is a genuine risk of disproportionate punishment. *People v. Holman*, 2017 IL 120655, ¶ 33. In *Roper*, *Graham*, and *Miller*, the United States Supreme Court addressed that risk and concluded that youth matters in sentencing. *Roper* held that the eighth amendment prohibited capital sentences for juveniles who commit murder. 543 U.S. at 578-79. *Graham* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit nonhomicide offenses. 560 U.S at 83. And

10

*Miller* held that the eighth amendment prohibited mandatory life sentences for juveniles who commit murder. 567 U.S. at 489-90.

¶ 39    Importantly, our supreme court in *Holman*, 2017 IL 120655, ¶ 43, adopted the *Miller* factors. Yet, as our supreme court has noted, the United States Supreme Court "has clearly and consistently drawn the line between juveniles and adults for the purpose of sentencing at the age of 18." *People v. Harris*, 2018 IL 121932, ¶ 58. It stated that "claims for extending *Miller* to offenders 18 years of age or older have been repeatedly rejected." *Id.* ¶ 61.

¶ 40    Williams was 19 years old when he committed these crimes, and therefore was foreclosed from making a *Miller* claim under the eighth amendment. However, the proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Our supreme court has explained that this emphasis on rehabilitative potential provides "a limitation on penalties beyond those afforded by the eighth amendment." *People v. Clemons*, 2012 IL 107821, ¶¶ 39-41. And it has acknowledged that young adult offenders are "not necessarily foreclosed" from raising as-applied challenges to life sentences based on the evolving science on juvenile maturity and brain development under the proportionate penalties clause. *People v. Harris*, 2018 IL 121932, ¶¶ 46, 48. See *People v. Thompson*, 2015 IL 118151, ¶¶ 43-44 (the as-applied, youth-based sentencing claim of an 18-year-old offender would be more appropriately raised in postconviction proceedings rather than on direct appeal); see also *Harris*, 2018 IL 121932, ¶ 48. "The court has thus opened the door to the possibility that a young-adult offender might demonstrate, through an adequate factual record, that his or her own specific characteristics were so like those of a juvenile that imposition of a life sentence absent the safeguards established in *Miller* was 'cruel, degrading, or so wholly

disproportionate to the offense that it shocks the moral sense of the community.' " *People v. Zumot*, 2021 IL App (1st) 191743, ¶ 27 (quoting *People v. Klepper*, 234 Ill. 2d 337, 348 (2009)).

¶ 41    Accordingly, we now turn to whether Williams's claim in his successive postconviction petition that his sentence was unconstitutional as applied to him was sufficient to justify further proceedings. We find two recent cases instructive. In *People v. White*, 2020 IL App (5th) 170345, the 20-year-old defendant appealed from the dismissal of his request for leave to file a successive postconviction petition, in which he asserted that his mandatory natural life sentences violated the proportionate penalties clause. *Id.* ¶ 13. In support of his contention, the defendant alleged that "prejudice resulted from failing to bring these claims earlier in that he had significant rehabilitative potential and had taken college course in prison, worked full time, and donated his time to a prison mural project." The Fifth District, in rejecting the defendant's proportionate penalties claim, stated:

> "Here, the defendant argues that we need not address his claim on the merits but,
> instead, should allow him the opportunity to develop his claim, with the assistance
> of counsel, as to whether *Miller* can apply to a 20-year-old for proportionate
> penalties purposes. *Harris*, however, made no mention of exactly what is
> necessary to overcome the high bar for leave to file a successive postconviction
> petition, and we find that a flat allegation as to evolving science on juvenile
> maturity and brain development is simply insufficient. [Citation.] Other than
> generally asserting studies that show that sometimes youthfulness can extend to a
> person's twenties, the defendant does not now allege how he was particularly
> affected by any immaturity, and it is undisputed that he did not suffer from any
> cognitive or developmental impairments." *Id.* ¶ 24.

12

¶ 42    Likewise in *People v. Moore*, 2020 IL App (4th) 190528, ¶ 40, the Fourth District found that "other than defendant's general assertion a 19-year-old's brain is more similar to a 17-year-old adolescent's brain rather than a fully mature adult's and noting the present offense being his first adult conviction, defendant's motion failed to provide any evidence to indicate how his own immaturity or individual circumstances would provide a compelling reason to allow him to file a successive postconviction petition." The defendant argued on appeal that he was abandoned by his father at a young age and that his mother struggled with drug addiction and keeping her children fed. *Id.* The court noted that those factual assertions were missing from his motion to file a successive postconviction petition and "instead, his motion merely asserted the brain development commonly associated with juveniles can also extend into young adulthood." *Id.*

¶ 43    The court further stated that "the standard for successive postconviction petitions is higher than initial petitions and a defendant is required to provide sufficient documentation. Defendant's flat assertion a 19-year-old's brain is more like a 17-year-old adolescent's in terms of development is simply insufficient to survive the more exacting standard that would warrant the filing of a successive postconviction petition." *Id.*

¶ 44    Here, beyond general assertions regarding adolescent and young adult brain development, Williams failed to plead any particular facts or include any documentation in his motion to file a successive postconviction petition indicating how his specific own immaturity or individual circumstances constitute compelling reasons to allow him to file a postconviction petition. Instead, his motion merely relies on articles containing general assertions that immaturity and brain development commonly associated with juveniles can also extend to young adulthood. Williams argued that *Miller* applies to him because "scientific research and national consensus indicated that a 19-year-old exhibit the same hallmark features of youth that justified the decision

in *Miller*." He stated that "research and articles discussed the differences between young adults, like Williams, and a fully mature adult." He contended that young adults are more similar to adolescents than adults because they are more susceptible to peer pressure, less future-oriented, and more volatile in emotionally charged settings. He stated that there have been recent trends in new legislation that consider age and maturity level of people under the age of 21. The only specific facts Williams alleged about himself was that his "youthfulness and lack of a criminal history of committing violent crimes are indeed relevant." That general assertion is insufficient to survive the more exacting standard that applies to a successive postconviction petition. *Edwards*, 2012 IL 111711, ¶¶ 26-27 (the cause-and-prejudice test for a successive postconviction petition involves a higher standard than the first-stage frivolous or patently without merit standard that is set forth in section 122-2.1(a)(2) of the Act).

¶ 45    To the extent that Williams relies on *People v. Minniefield*, 2020 IL App (1st) 170541, and *People v. Carrasquillo*, 2020 IL App (1st) 180534, we find those cases to be unpersuasive. Both cases stand for the proposition that a petitioner can show prejudice by establishing a "catch 22" – without a developed record, he cannot show his constitutional claim has merit, and without a meritorious claim, he cannot proceed to develop a record. However, those cases appear to conflict with controlling precedent requiring that, to obtain leave to file a successive postconviction petition asserting a violation of the proportionate penalties clause, a petitioner must provide some evidence or documentation demonstrating that the petitioner's own brain development was delayed. See *Smith*, 2014 IL 115946, ¶ 35 (documentation required to allow circuit court to determine whether the cause-and-prejudice test was met).

¶ 46    Finally, we find Williams's reliance on *People v. Daniels*, 2020 IL App (1st) 171738, to be misplaced. In *Daniels*, the defendant, who was 18 years old at the time of the murder, raised

an as-applied challenge to his life sentence in a successive postconviction petition, alleging that he had been prescribed psychotropic medication, had an "unusually harsh childhood[,] and suffered from a number of psychological conditions that could have inhibited his development and caused him to act impulsively." *Id.* ¶ 33. This court found that Daniels had shown prejudice in part because he had "directed this court's attention to at least some contemporaneous documentation regarding his mental health and personal characteristics that he might use to support" his proportionate penalties claim. *Id.* ¶ 35. In the case at bar, there was nothing to indicate in Williams's motion for leave to file a successive postconviction petition that he had a troubled childhood or any sort of psychological condition.

¶ 47                                        III. CONCLUSION

¶ 48     The circuit court properly denied Williams's motion for leave to file a successive postconviction petition because he failed to sufficiently set forth a basis for a proportionate penalties clause claim. Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 49     Affirmed.